**In re SCANDIA BUILDERS, INC., Debtor.**

**Kyle R. WEEMS, Trustee of Hamilton Mortgage Corporation and Federal Deposit Insurance Corporation, Appellants,**

v.

**SCANDIA BUILDERS, INC., Appellees.**

**No. B77–1600A.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Feb. 16, 1978.

**116**

J. M. Hewson, III, Savannah, Ga., Robert C. Boozer and David G. Bisbee, Troutman,

Sanders, Lockerman & Ashmore, Atlanta, Ga., for debtor appellee Scandia Builders, Inc.

Joseph J. Burton, Jr., Atlanta, Ga., for Kyle Weems.

Paul Burke O'Hearn, Atlanta, Ga., for Federal Deposit Insurance Corp.

## ORDER OF COURT

MOYE, District Judge.

This bankruptcy matter involving an arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. §§ 701–799, is before this Court on appeal from orders of the bankruptcy court of September 2, and 29, 1977. By these orders the bankruptcy court authorized the debtor to borrow up to $50,-000 and to secure that debt with certificates of indebtedness which would have priority over any preexisting secured interest. Appellants [1] now hold the senior deeds to secure debt on debtor's assets and they claim that the issuance of any superior certificates of indebtedness (first lien certificates) would greatly prejudice their interest. Appellants challenge both the authority of the bankruptcy court to issue such certificates and the equity of doing so in this particular case.

The pertinent facts of this case are as follows: the debtor, Scandia Builders, Inc., is a Georgia corporation engaged in the business of developing, building and selling single-family dwellings on residential lots. Debtor's principal current assets consist of 11 houses which are 80 to 95 percent completed and 29 developed residential lots. Appellants hold first lien security deeds on these assets. First Georgia Bank and Sea Island Bank hold second and third lien security deeds on the same property. Debtor's 11 incomplete houses, which are scattered throughout existing residential neighborhoods in Clayton County, Georgia, are currently unsold and have remained unoc-

---

1. Hamilton Mortgage Corporation (HMC) was the original lendor and secured party. HMC assigned virtually all of its interest in the loans to Hamilton National Bank. Presently, the Federal Deposit Insurance Corporation, acting as the bank's liquidator, has assumed the bank's rights and liabilities. The remaining interests of HMC are now in the hands of Kyle R. Weems, HMC's trustee in bankruptcy.

cupied for almost two years. All of the incomplete houses are weatherproof and have been boarded shut or locked, and they are inspected regularly to insure that they remain secure. Nevertheless, the houses are attacked by incidents of vandalism and suffer from depreciation as the cost of repairs and completion are pushed up by inflation. The current fair market value of the uncompleted houses is no more than the existing first mortgage debt. However, Scandia is confident that if it is allowed to complete its houses at a cost of $50,000 the fair market value of the houses will rise by nearly $100,000. If that is true, it may be able to pay off the secured debtors and still have sufficient assets to work out a Chapter XI plan of payment for unsecured creditors and thereby remain in business. The bankruptcy court endorsed this position and authorized the issuance of first lien certificates to secure the loan needed to complete the houses.

By this appeal, appellants raise two issues: (1) whether the bankruptcy court has the authority to issue certificates of indebtedness which subordinate nonassenting preexisting lien holders, and (2) assuming the authority of the bankruptcy court to issue such certificates, whether the issuance in this case was equitable.

■ There has been much debate among the bankruptcy courts regarding the authority of that court to interfere with the rights of secured creditors in Chapter XI proceedings. *Compare In the Matter of St. Simons Properties*, 11 C.B.C. 729 (Bankr.Ct. N.D.Ga., 1976), and *In re Security Investment Properties, Inc.*, B74–2506A (Bankr. Ct.N.D.Ga., February 18, 1975), *with In re Habersham-on-Lanier, Inc.*, B77–13G (Bankr.Ct.N.D.Ga., July 13, 1977), remanded from District Court, Dec. 21, 1977. On the district court level, however, this question has received only sparse discussion. At the center of this controversy is section 344 of the Bankruptcy Act which provides as follows:

> During the pendency of a proceeding for an arrangement, or after the confirmation of the arrangement where the

court has retained jurisdiction, the court may upon cause shown authorize the receiver or trustee, or the debtor in possession, to issue certificates of indebtedness for cash, property, or other consideration approved by the court, upon such terms and conditions and with such security and priority in payment over existing obligations as in the particular case may be equitable.

11 U.S.C. § 744. Clearly, the specific language of this section grants to the bankruptcy court the authority to issue certificates of indebtedness. The real question is whether these certificates may interfere with the rights of secured parties.

■ There is no statutory language or case law precedent to answer this question. However, a study of the general purposes of Chapter XI is helpful. Chapter XI, by its terms, is a proceeding which is utilized to arrange a debtor's obligations to unsecured creditors. The history of Chapter XI, as set forth in *SEC v. American Trailer Rentals Co.*, 379 U.S. 594, 85 S.Ct. 513, 13 L.Ed.2d 510 (1965), and 8 *Collier on Bankruptcy* ¶ 6.40[7.2], at 972, reveals that it was not intended to interfere with the rights of secured parties. Before passage of § 77B of the Bankruptcy Act, 48 Stat. 912, bankruptcy procedures offered no facilities for corporate rehabilitation. That was left to equity receiverships or common law arrangements and extensions. The lack of judicial control of this procedure and the attendant problems led to the enactment of section 77B(c) in 1934. That section permitted the adjustment of all interests in the debtor, secured creditors, unsecured creditors and stockholders. The 1934 Act specifically empowered courts of bankruptcy to issue certificates of indebtedness which could be given "priority in payment over existing obligations, *secured or unsecured.*" (emphasis added). In 1938, section 77B was revised, and out of that revision came Chapter X and Chapter XI of the Bankruptcy Act. Chapter X was designed to afford greater control of the reorganization proceedings, and the authority of the bankruptcy court to issue first lien certificates of indebted-

ness was maintained. Specifically, the language of former section 77B(c) providing for certificates with priority over "existing obligations, secured or unsecured" was enacted into section 116 of Chapter X. However, the pertinent section of Chapter XI, section 344, dropped the reference to certificates having priority over secured debts. In making this change in wording, Congress must have intended some purpose. This Court cannot conclude that it was inadvertent. *See Weiss v. United States*, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298 (1939). Moreover, the purposes of Chapter XI were much different from those of Chapter X. Chapter XI was limited to an adjustment of unsecured debts and was intended as a statutory variation of the common law composition. The contrasts between the two chapters are quite marked. The process for formulating an arrangement under Chapter XI sacrifices to speed and economy virtually every safeguard provided by Chapter X. *SEC v. United States Realty & Improvement Co.*, 310 U.S. 434 at 450–51, 60 S.Ct. 1044, 84 L.Ed. 1293. In short, Chapter XI provides a summary procedure whereby judicial confirmation is obtained on a plan which has been formulated and accepted with only a bare minimum of independent control or supervision. This, of course, is consistent with the purpose of Chapter XI which is to provide a quick and economical means of facilitating simple compositions among general creditors who have been deemed by Congress to need only the minimal disinterested protection provided by that chapter.

■ In light of this background, the omission of reference to secured debts in section 344 takes on added significance.[2] The Court concludes that the absence of statutory authorization to subordinate the rights of secured parties indicates that Congress did not intend to expand the practice of issuing first lien certificates of indebtedness beyond what it·was under the common

law composition and extension cases. However, the Court is reluctant to find that the bankruptcy court is always powerless to subordinate preexisting liens. At common law, courts had inherent, albeit limited, power to subordinate the rights of secured creditors. Those common law equitable powers form the basis for the issuance of first lien certificates in Chapter XI proceedings. *See* 8 *Collier on Bankruptcy* ¶ 6.40[7.-2], at 974. Therefore, the Court agrees with those cases which have held that certificates of indebtedness may subordinate preexisting liens only when it is necessary to preserve the debtor's assets. *See, e.g., In the Matter of Habersham-on-Lanier, Inc.*, B77–13G (N.D.Ga., Dec. 21, 1977); *In re Security Investment Properties, Inc.*, B74–2506A (N.D.Ga., February 18, 1975). Indeed, the bankruptcy court has a responsibility to protect the debtor and unsecured creditors over whom it has jurisdiction as well as the secured creditors who are prevented from foreclosure pursuant to section 314, 11 U.S.C. § 714.

■ It has been argued that as a part of preserving its assets the debtor should be allowed to issue first lien certificates to secure new income and capital as a hedge against inflation and depreciation. This Court disagrees. Economic factors are the silent enemies of any frozen asset. If the bankruptcy court were called upon to constantly monitor the real market value of debtor's assets, its involvement in the Chapter XI proceeding would far exceed that contemplated by the Act. Ordinarily, the bankruptcy court should not exercise its power to increase the risks of secure parties in the name of protecting the assets from inflation and depreciation. However, if these economic factors threaten to cause substantial damage to debtor's property, the solution may be to lift the automatic stay provisions of section 314 and allow foreclosure. Under those circumstances, it

---

**2.** The Court notes that section 446, 11 U.S.C. § 846, as part of Chapter XII, similarly omits reference to secured debts; yet some bankruptcy judges have construed that section as broadly as section 116. *See In the Matter of St.* *Simons Properties*, 2 B.C.D. 1400 (N.D.Ga. 1976). However, such cases are inapplicable to the one at bar given Chapter XII's broad application to secured debts in general.

is unlikely that "good cause" for freezing the assets would remain. See 11 U.S.C. § 714.

■ Furthermore, the bankruptcy court must not subordinate secured parties in the broad interest of increasing the value of the asset so that all creditors may ultimately fare better. A Chapter XI court should not force the secured party to take risks which he feels secure against, specifically, a superior lien. This is true regardless of estimates of success or hope for the debtor's future. A secured party does not lend money with an attitude of the greatest good for the greatest number. He lends with an attitude of self-interest and protection for his investment. Such is the nature of a secured party, and Chapter XI allows for him to maintain that self-interest. If the debtor finds it impossible to arrange his affairs in the face of anxious secured interests, the Bankruptcy Act provides relief under chapters other than Chapter XI.

■ From the foregoing discussion, it can be concluded that certificates of indebtedness which are issued for the preservation of the asset are the exception rather than the rule. The debtor has the burden to show: first, that the cash, goods or services which the debtor hopes to purchase with the first lien certificates are essential to the preservation of the asset. It is not enough that the added value would be helpful or useful. Therefore, an inquiry should be made into whether the essential purpose of preserving the status quo can be accomplished with substantially less impact on the preexisting lien holders. Moreover, the central concern should be with preserving the status quo to protect the parties from catastrophic loss. Thus, first lien certificates will most often be issued for purposes in the nature of paying taxes, purchasing insurance or hiring security guards. *See* 8 *Collier on Bankruptcy* ¶ 6.40[7.2], at 975. Second, the debtor should show that certificates are not saleable without being made a first lien. *See In re Prima Co.*, 88 F.2d 785, 790 (7th Cir. 1937). This requirement was applied to old section 77B which specifically authorized first lien certificates. It should be applied to Chapter XI proceedings *a fortiori*.

Having found that the bankruptcy court has limited authority to issue first lien certificates in a Chapter XI proceeding, and having discussed the various situations in which they may be issued, the Court's attention is now directed to whether the bankruptcy court exceeded its authority in authorizing first lien certificates in the case at bar. In doing so, this Court must uphold any findings of fact unless they are clearly erroneous. Bankruptcy Rule 810.

■ The bankruptcy court found that it was necessary to complete and sell debtor's houses in order to stem the decreasing value due to depreciation, inflation, and vandalism. There is nothing in the record to indicate that depreciation and inflation are affecting debtor's property in any extraordinary or unusual manner. As was stated earlier, first lien certificates should not be issued to combat such routine economic ills. While the bankruptcy court should be concerned with preventing vandalism to debtor's property, there is no evidence to support the assumption that completion of the houses is the least burdensome means to effectuate that end. The debtor made no showing that precautions such as security guards or insurance were unavailable or more costly. Moreover, while there was evidence that no one would complete the houses without a first lien certificate, there was no showing by the debtor that more conventional means of security could be obtained only by resorting to first lien certificates.

In the case at bar, the indications are clear that the debtor sought to do more than protect the current value of the asset. He sought to increase its value to benefit his arrangement. Even if this Court were to agree that completion of the houses may be in the best interest of the debtor and the unsecured creditors, Chapter XI does not allow the debtor's interest to interfere with the rights of the secured party. Such interference, by way of first lien certificates, should be allowed in rare and unusual circumstances when relatively small expendi-

tures are necessary to preserve the status quo.

In conclusion, the Court finds that the record below is insufficient to support a finding that the bankruptcy court applied the applicable standards, as discussed by this Court, in permitting the issuance of first lien certificates. Accordingly, this case is REMANDED to the bankruptcy court for proceedings not inconsistent with this order.

SO ORDERED, this 16 day of February, 1978.