In the Matter of BOUQUET INVEST-MENTS, A California Limited Partnership, Debtors.

Ray MARGELL and Mabel Margell, Plaintiffs,

v.

BOUQUET INVESTMENTS, A California Limited Partnership, Defendants.

No. M3–78–JA

Bankruptcy No. 83–11953–JA.

United States Bankruptcy Court, C.D. California.

Sept. 21, 1983.

Leon D. Bayer, Slate & Leoni, Los Angeles, Cal., for plaintiffs.

Robert D. Bass, Angel & Neistat, Los Angeles, Cal., for defendants.

## MEMORANDUM OF DECISION

JOHN D. AYER, Bankruptcy Judge.

This case has the virtue of presenting an important issue, clearly defined. It has the additional merit, distinctive in these extraordinary times, of presenting an issue that I almost certainly have the power to decide. The question is whether an equity cushion alone, without more, is sufficient to support the automatic stay, or whether, by contrast, the creditor may have relief to liquidate his collateral. On the facts of this case, I find that an equity cushion alone is insufficient to support the stay and, accordingly, I grant relief.

The debtor and defendant, Bouquet Investments ("Bouquet"), is a California limited partnership. The creditors and plaintiffs are Ray and Mabel Margell ("the Margells"). The only significant asset in the estate is a piece of raw land in Los Angeles County. The Margells sold the land to Bouquet, taking back a purchase-money deed of trust. Bouquet filed its Chapter 11 petition on July 27, 1983. The Margells filed their complaint on August 4, and the parties appeared for trial on September 1.

Bouquet and the Margells stipulated that the Margells' claim as of September 1 stands at $166,577, and that interest continues to accrue at $41.07 per day. The annual percentage rate on Margells' note is nine percent. The loan was written in 1978 when nine percent may well have been the going rate. The parties seem to agree (and, in any event, I will take judicial notice of the fact) that nine percent is well below the market rate today. The parties also stipulated that installment payments have been in arrears since January 30, 1983—that is to say, about eight months—and that the arrearages (included in the claim) currently total $11,277. Finally, the parties stipulate that the Margells have advanced $11,300 (also included in the claim) for delinquent taxes.

At the trial, each side called only one witness—an appraiser. The Margells' appraiser said the land is worth $133,000. Bouquet's appraiser said the land is worth $276,000. In other words, if I believe the Margells' appraiser, then the property is worth some $33,000 less than the debt. If I believe Bouquet's appraiser, the property is worth $110,000 more than the debt. It is this $110,000 that constitutes the alleged "equity cushion," a concept that subsists in the bankruptcy lexicon somewhere between folklore and term of art. *See generally* Weintraub & Resnick, *From the Bankruptcy Courts: Puncturing the Equity Cushion—Adequate Protection for Secured Creditors in Reorganization Cases,* 14 U.C. C.L.J. 284 (1982). Bouquet made, and the Margells accepted, an offer of proof that the property is necessary to an effective reorganization. *See* 11 U.S.C. § 326(d)(2) (Supp. IV 1981).

On this record, Bouquet rested its case for continuation of the stay. Counsel argued that he had shown that there was equity in the property, and that it was necessary to an effective reorganization, entitling Bouquet to continuation of the stay under 11 U.S.C. § 362(d)(2) (Supp. IV 1981). He also argued that the "equity cushion" constituted adequate protection sufficient to require continuation under 11 U.S.C. § 362(d)(1) (Supp. IV 1981).

I find that Bouquet would prevail under § 362(d)(2), but that the Margells are entitled to relief under § 362(d)(1). Put most succinctly, my view is that Bouquet should not be permitted to speculate at the Margells' expense. Because of the importance of the issue, and the clarity with which it is presented on these facts, I think it is desirable that I try to spell out just what I am, and am not, holding.

In the first place I am willing to assume, at least for purposes of this analysis, that there was substantial equity in the property. Both appraisers seemed competent and each told a plausible story, devoting much of his attention to sale prices of properties that might (or might not) be comparable to the land in the case. As a whole, I though

Bouquet's appraiser had somewhat the better of things. Counsel introduced a written report, complete with color photographs, and he led the appraiser through detailed testimony on 11 supposedly comparable properties. The Margells' appraiser, for his part, seemed to me to be somewhat less familiar with his case. On the other hand, the Margells' appraiser carried conviction when he contended that development restrictions inhibit the marketability of the property and will correspondingly reduce its price. Taking all things together, it seems clear that Bouquet demonstrated that the property is worth substantially more than $166,000 though not, perhaps, as much as $276,000.

Whatever the correct number may be, I am willing to assume it is at least high enough so I may find that the debtor has indeed demonstrated that there is equity in the property. 11 U.S.C. § 362(d)(2) (Supp. IV 1981) provides that the creditor may have relief if the debtor has no equity in the property and the property is not necessary to an effective reorganization. Since Bouquet has proven that it has equity, and since the Margells have conceded that it is necessary to an effective reorganization, it seems beyond dispute that the Margells may not have relief under § 362(d)(2).

All of this brings us back to 11 U.S.C. § 362(d)(1) (Supp. IV 1981), which provides that the creditor may have relief "for cause, including the lack of adequate protection." This is the language that poses the issue of the equity cushion—specifically, the question whether the cushion of surplus equity alone will constitute "adequate protection" sufficient to debar the creditor from relief.

In finding that equity alone is insufficient here, I am aware that I am out of tune with the rhetoric of a great number of other bankruptcy cases. *See, e.g., In re Curtis,* 9 B.R. 110, 112 (Bkrtcy.E.D.Pa.1981) ("the classic form of protection for a secured debt"). But in fact, I think this decision is not nearly so novel as it may seem. To understand why, and to understand why it makes sense to grant relief in this case, I think it may be useful to reflect

a bit on the purposes of bankruptcy law. After all, the State of California provides a mechanism for creditors who want to liquidate their collateral when debtors default on their obligations. It cannot have been the purpose of Congress to establish the Bankruptcy Court as a federal court of review for the state law of creditors' rights. *Cf. Barnette v. Evans,* 673 F.2d 1250 (11th Cir.1982). On the other hand, there are some goals which bankruptcy (seemingly) can accomplish that appear beyond the reach of the ordinary law of creditors' rights. One way of discerning whether relief is proper in this case is to try to consider what, if any, goals can be accomplished via bankruptcy that cannot be accomplished at state law. And this task requires some consideration of the special nature of bankruptcy law.[1]

To begin with, bankruptcy is a collective remedy, designed to serve the interests of all creditors, not just a single creditor. This is obvious in the law denouncing preferences, *see* 11 U.S.C. § 547 (Supp. IV 1981), or fraudulent conveyances, *see* 11 U.S.C. § 548 (Supp. IV 1981), and other similar principles calculated to enforce equity between competing claims. It is perhaps less obvious, but still present, in the rules governing liquidation of collateral. After all, if a single creditor is charged with liquidating the collateral, his only interest is to see that it yields enough to satisfy his claim. Only the creditor group as a whole can be expected to serve the interests of all creditors.

But bankruptcy also serves the needs of the debtor in ways that state law does not. Most obviously, bankruptcy law provides the debtor with a discharge, the proverbial "fresh start," so distinctive in the law of the United States. *See* Boshkoff, *Limited, Conditional and Suspended Discharges in Anglo-American Bankruptcy Proceedings,* 131 U.Pa.L.Rev. 69 (1982). But additionally the debtor, like the creditors, may have an interest in maximizing the yield available to

creditors, most obviously if he wants to win acceptance of a plan, so that the enterprise may continue after the bankruptcy case.

It is in this perspective that I think we should consider the relationship of bankruptcy to state law. So informed, I think it is possible to understand a case like *In re Blazon Flexible Flyer,* 407 F.Supp. 861 (N.D.Ohio 1976), which may be the seminal case on the issue of the equity cushion. Blazon was a toymaker, employing as many as 250 to 300 people in the peak season. Blazon had more than $2 million in unsecured debt. The secured creditor, whose claim exceeded $1 million, wanted his collateral. The court said that to let him have the collateral "would enable said company to close down and necessitate liquidation of the assets." *Id.* at 864. The court also held that the secured creditor had collateral worth more than four times his claim. The court said that under the circumstances it would be "totally unconscionable and inequitable" to let the secured creditor foreclose. *Id.; see also* 11 Collier Bankr.Cas. (MB) 723 (Bankr.N.D.Ohio (1976)) (additional facts set forth in the opinion on confirmation). The court did not specify just why it would be "totally unconscionable and inequitable," but it seems a fair inference from the record that this is the sort of case where important going-concern values would be lost if the secured creditor were permitted to defeat the reorganization.

*In re Llewellyn,* 27 B.R. 481 (Bkrtcy.M.D. Pa.1983) seems to me to be the same sort of case. The collateral was machinery, inventory, equipment, work in progress, and receivables, all in the possession of an unincorporated print shop. While the record is not explicit on the point, it seems almost certain to have been the sort of situation where there are other creditors, and where the collateral is worth much more as part of a going concern than sold piecemeal at a secured creditor's liquidation sale. *See also In re QPL Components, Inc.,* 20 B.R. 342 (Bkrtcy.E.D.N.Y.1982).

1. The subsequent paragraph draws generally on Warren, *Bankruptcy Law in the United States* (1935); Levinthal, *Early History of* *Bankruptcy Law,* 66 U.Penn.L.Rev. 223 (1918); Riesenfeld, *The Evolution of Modern Bankruptcy Law,* 31 Minn.L.Rev. 401 (1947).

*Bouquet* is, of course, nothing like *Blazon* or its kin. From the schedules, it is apparent that the only other significant creditor/claimant in *Bouquet* is the general partner of the Bouquet partnership. No one is suggesting that the land be broken up and sold piecemeal—indeed it is hard to imagine just how such a result could be accomplished. The issue is rather: who will be permitted to get any speculative gain on the property, the seller/creditor or the buyer/debtor?

I do not mean to suggest that the protection of the stay is unavailable in real estate cases. Quite the contrary, there are real estate cases that fit the analysis of *Blazon* rather well. *In re San Clemente Estates,* 5 B.R. 605 (Bkrtcy.S.D.Cal.1980), is instructive. Here the creditor provided construction financing for a major subdivision development project. The debtor ran into a cash crunch, and the creditor, with a claim of some $2.4 million, sought to foreclose. The creditor's appraiser valued the land at $3.75 million, but the court chose instead to value it at $5.319 million as a subdivision, noting that the value would collapse to $3.9 million if it reverted to raw land. Thus on the one hand, the court could see that there would be substantial losses if the land were not maintained in the subdivision project (and it appears that there must have been other creditors). On the other hand, taking even the creditor's own low valuation, the creditor was still oversecured. Perhaps most forceful in favor of the court's view is the fact that by the time the court came to publish its opinion, there was a sale *already pending* at $5.1 million. It seems to me that cases like this stand on a different footing from *Bouquet. See also In re Rogers Development Corp.,* 2 B.R. 679 (Bkrtcy. E.D.Va.1980).

Other cases utilizing an equity cushion for relief arise under Chapter 13. Here, there are several possible grounds for distinction. Perhaps the central fact is that the property is ordinarily the debtor's home, and courts are understandably reluctant to put a debtor out of his home unless there is no alternative. But also in the nature of things under Chapter 13, the debtor at the

very beginning of the case will propose a plan. Moreover, the Code sharply restricts the power of the court to affect the residential real estate secured creditor under Chapter 13; *see especially* 11 U.S.C. § 1322(b)(2) (Supp. IV 1981). Hence the court can assume that he will get paid according to his contract fairly quickly. *In re Curtis,* 9 B.R. 110 (Bkrtcy.E.D.Pa.1981), for example, was a Chapter 13, and the opinion indicates that confirmation of a plan was pending at the time of the decision. *In re Pitts,* 2 B.R. 476 (Bkrtcy.C.D.Cal.1979), apparently the most closely relevant case from this district, also was a Chapter 13. Additionally, the decision in *Pitts* was provisional, with the court continuing the matter for further hearing a month and a half later. *See also In re Cote,* 27 B.R. 510 (Bkrtcy.D.Ore.1983) (residence; Chapter 13); *Cf. In re Adams,* 27 B.R. 582 (D.C.D.Del.1982) (Chapter 7; individual residence; stay retained pending resolution of other litigation). It should be obvious that the same kind of appeal cannot be advanced for a debtor holding a piece of raw land.

At least one other factor deserves notice. Characteristically in stay cases, the creditor is an institution—a bank—and the court seems simply to be saying that the institutional creditor can sustain the cashflow crunch better than the debtor. Thus the court in *San Clemente Estates* took note of the fact that the creditor was "A moderate sized institution with over one hundred million dollars in real estate loan outstanding." *See In re San Clemente Estates,* 5 B.R. 605, 606 n. 2 (Bkrtcy.S.D.Cal.1980). Superficially, it may seem that courts should not use that sort of fact as a consideration, one way or another. It is an axiom of our jurisprudence that we all stand equal before the law, and I suppose I should accept the right of rich banks, as well as poor banks, to sleep under bridges. But it seems to me logically impossible *not* to consider at least indirectly the economic situation of the parties. Either I address it directly, as the court did in *San Clemente,* or I ignore it, which is another way of saying that we treat it as not worth addressing. In this case, strictly speaking, I know very little about the fi-

nancial situation of the creditors. They once owned a piece of land. They had $11,000 available earlier this year for real estate taxes. They are not a bank. Under the circumstances, I am not willing to assume that they can continue to sustain the negative cash flow they have experienced these last few months, even if there is equity.

The Margells also stress the fact that the nine percent loan is below the market rate. Their position is that they want to cash out now and put their money to work more productively. Under the circumstances of this case, I think that is a relevant consideration, although I do not think it is in itself compelling. The interest rate alone is, after all, a business risk and if Bouquet were current on its payments, there would be no question but that the Margells would have to live with the 1978 rate. In the same vein, the Ninth Circuit Bankruptcy Appellate Panel just recently held that invocation of the stay itself does not trigger an obligation to pay interest at the market rate. *See American Mariner Industries, Inc.,* 27 B.R. 1004 (9th Cir.Bkrtcy.App.1983); *see also* Comment, *Compensation for Time Value as Part of Adequate Protection During the Automatic Stay in Bankruptcy,* 50 U.Chi.L. Rev. 305 (1983). But taken in the context of the other factors in this case, I think the low interest rate can be a relevant consideration.

Having said this much, it is perhaps worthwhile to remark on one feature of bankruptcy law that is conspicuously irrelevant to a case like this, and that is the bankruptcy discharge. It is almost axiomatic that the dominant motive of most people who file straight bankruptcy petitions is the desire for the discharge. *See generally* Monograph No. 24, CONSUMER BANKRUPTCY STUDY, VOL. II, PERSONAL BANKRUPTCY: CAUSES, COSTS AND BENEFITS (Credit Research Center, Purdue Univ. 1982). Probably that is true, but it is remarkable that it is almost certainly not the motive here. It appears from the schedules that the Margells were purchase-money lenders, and a purchase-money lender cannot have a deficiency judgment under California mortgage law.

*See* Cal.Civ.Proc.Code § 580b (West 1981). Saying there is no right to a deficiency is the same as saying there is no personal liability on the debtor. Protection against personal liability is the functional equivalent of a discharge available (at least to the single-asset real estate debtor) at state law. *Cf. also* Cal.Civ.Proc.Code § 580d (West 1981) (no deficiency after nonjudicial sale).

Stay litigation has mushroomed in the bankruptcy court. At bottom, of course, is the novelty of the stay itself, which for present purposes can be perceived as dating back no further than October, 1979. *See* 2 Collier on Bankruptcy ¶ 362.01[1] (15th ed. 1983). A corollary reason is the general uncertainty over when relief from the stay is justified. I would like to reduce that uncertainty if possible, and I suspect I have not done so: the fact situations are too various, and our understanding of our purposes is still too unclear. But for this case, it seems to me that relief is justified as a matter of law.

This memorandum of decision shall constitute findings of fact and conclusions of law as mandated by Bankruptcy Rule 7052.