**ANCHOR SAVINGS BANK FSB**

v.

**SKY VALLEY, INC.**

**Civ. No. 2:88–cv–0126–WCO.**

United States District Court,
N.D. Georgia,
Gainesville Division.

Jan. 24, 1989.

Kirk W. Watkins, Atlanta, Ga., for Anchor Savings Bank FSB.

John M. Levengood, Atlanta, Ga., for Sky Valley, Inc.

## ORDER

O'KELLEY, Chief Judge.

This case is before the court on the appeal of Anchor Savings Bank FSB (Anchor) from the bankruptcy court's September 12, 1988, order (the Sept. 12 Order) granting the debtor, Sky Valley, Inc., authorization pursuant to 11 U.S.C. § 364(d)[1] to obtain superpriority financing from Bank South NA, an existing undersecured junior lienholder.

This is apparently a case of first impression in this circuit. Section 364(d) provides that a bankruptcy court may authorize the debtor to obtain credit secured by a senior lien on property of the estate if the credit is otherwise unavailable and if the secured interests of the displaced lienholders are adequately protected. In the instant case, a first priority lienholder, Anchor, with a sizeable equity cushion, objected to the authorization of superpriority financing of approximately $425,000, a modest amount relative to the total enterprise of the debtor, valued at $10.5 to $12 million. Anchor argued, *inter alia*, that it is not adequately protected because the debtor has no equity in its property, considering all encumbrances against all assets, and because the debtor has sustained negative cash flow and is not likely to successfully reorganize. The debtor countered that Anchor's interest is adequately protected by the large

---

**1.** Section 364(d), titled "Obtaining credit," provides:

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

equity cushion, and that Anchor lacks standing to assert the rights of non-objecting secured creditors. The bankruptcy court, finding that Anchor was adequately protected by an equity cushion of at least 160% and was not likely to become undersecured in the future, authorized the superpriority financing.

This court granted Anchor's motion for a stay pending appeal largely because the law is unsettled regarding whether an equity cushion alone may provide adequate protection. The court was concerned that the immediate implementation of the bankruptcy court's order would moot Anchor's appeal and that Anchor would permanently lose its valuable and bargained-for first priority position.

After considering the thorough briefs and skillful arguments of the parties, the court has concluded that the bankruptcy court's order should be affirmed. The court has accepted the bankruptcy court's findings of fact where not clearly erroneous but has independently determined the applicable law. *Scroggins v. Powell, Goldstein, Frazer & Murphy (In re Kaleidoscope, Inc.)*, 25 B.R. 729, 736 (N.D.Ga.1982). While the presence of an equity cushion may not provide adequate protection to a primed lienholder in every case, the court finds that under the circumstances in this case Anchor is adequately protected.

The bankruptcy court found, in the Sept. 12 Order, that, as of July 31, 1988, Anchor's first priority security interest was approximately $2,852,000. The property of the debtor which secured that lien was worth about $8,542,000, leaving an equity cushion of about $5.7 million. (Sept. 12 Order, pp. 3, 7, 15). A large portion of the property securing Anchor's interest was raw or undeveloped land, and the analysis of the value of the collateral was based on the debtor's assets as they existed and not on the successful development of the Sky Valley resort community. The evidence presented did not indicate that the value of the debtor's assets was likely to decrease substantially.

On the issue of adequate protection, the court finds that the weight of existing authority of other circuits supports the decision of the bankruptcy court to authorize the superpriority financing requested by the debtor.[2] In the instant case, the displaced lienholder is substantially oversecured and is likely to remain so, as the evidence does not suggest the value of the debtor's assets will rapidly deteriorate. The facts of *In re Dunes Casino Hotel*, 69 B.R. 784 (Bankr.D.N.J.1986) were very similar. In *Dunes*, the Chapter 11 debtor sought to incur indebtedness secured by a senior lien on certain real property already encumbered by a mortgage. The proceeds of the loan, approximately $700,000, were to be used for the payment of property taxes, for repairs to the debtor's hotel, for operating deficits, and for the marketing and promotion of the debtor's public offering. The court found that the debtor had made an effort to obtain credit by means other than a superpriority lien and that such financing was not available. *Id.* at 796. The court heard extensive evidence on the value of the debtor's assets and the amounts of existing liens. The court found

---

2. For other cases supporting this position, see: *Bray v. Shenandoah Federal Savings & Loan Ass'n (In re Snowshoe, Inc.)*, 789 F.2d 1085 (4th Cir.1986), finding of adequate protection for § 364 superpriority financing was based on presence of substantial equity cushion and on well-reasoned financial analysis of an experienced and respected trustee, including his conclusion that the debtor would be able to repay the new loan within one year; *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396 (9th Cir.1984), finding of adequate protection for § 362 relief from stay based on 20% equity cushion.

In *In re Alyucan Interstate Corp.*, 12 B.R. 803 (Bankr.D.Utah 1981), a § 362 relief from stay case, the court rejected the equity cushion analysis, holding that an equity cushion is not always necessary to satisfy a requirement of adequate protection. The court denied relief from the stay, finding that the objecting creditor was adequately protected despite the small and rapidly deteriorating equity cushion. The court held that the concept of adequate protection, designed to balance the rights of creditors and debtors and to avoid the impairment of the liens of secured creditors, necessarily depends on the facts of each case. While the equity cushion analysis "may be helpful in general," it fell short in that particular fact pattern. *Id.* at 813.

that, after the superpriority financing, the interest of the objecting secured party would be protected by an equity cushion of at least $8 million, almost 50% of the $17.7 million debt. The court further found that interest was accruing on the secured party's mortgage at the rate of about $2 million per year, and therefore it would take several years for the equity cushion to fully erode. *Id.* at 795.

The court employed a detailed equity cushion analysis in regard to the secured party's motion for relief from the stay under § 362[3] and then stated that the analysis was "equally applicable to adequate protection analysis employed by courts under § 364(d)." *Id.* at 796, citing *Bray v. Shenandoah Federal Savings & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085 (4th Cir.1986); *In re Stanley Hotel, Inc.*, 15 B.R. 660 (D.Colo.1981); *In re Stratbucker*, 4 B.R. 251 (Bankr.D.Neb.1980). The court noted that courts which had rejected the equity cushion analysis had used an impairment of lien analysis and found that under either analysis the interest of the secured creditor was adequately protected. *Id.* at 795. The court actually collapsed the distinction between the two, saying, "[i]f the concept of adequate protection is deemed to protect the value of the creditor's lien from depreciation, the existence

of the substantial equity cushion in this case provides such protection." *Id.* The court allowed the borrowing and expenditure of additional funds in the interests of the ultimate success of the reorganization: "[t]he debtor should be allowed the opportunity to reorganize so that it can make its other creditors whole as well." *Id.*

In the instant case, the relative amount of the desired lien and the uses to which the funds are to be put are very similar to the *Dunes* facts. The bankruptcy court found that the debtor was unable to obtain unsecured credit or credit secured by a junior lien.[4] After receiving extensive valuation evidence, the court found an equity cushion of about 200%, and even under the analysis offered by Anchor the cushion was more than 160%. Anchor has emphasized that the debtor's liabilities are mounting at the rate of $1 million per year in accruing interest. As in *Dunes*, however, the complete erosion of the equity cushion in the instant case merely by the addition of unpaid interest will take several years, and there is scant if any evidence that the debtor's assets are depreciating in value. Accordingly, the court finds that Anchor is adequately protected, and the bankruptcy court did not err when it granted authorization for a superpriority lien.[5]

---

**3.** Section 362, titled "Automatic stay," provides:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay ... such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property ... if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

**4.** *See,* Sept. 12 Order. *Snowshoe* instructs that § 364(d) requires that a debtor make a good faith effort to obtain credit without granting a senior lien on previously encumbered property. The debtor in the instant case approached all lenders reasonably likely to be willing to make a junior or unsecured loan, and each rejected the debtor's proposal. The debtor satisfied the requirement that other credit be unavailable.

**5.** Anchor cited *In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 376 (Bankr.E.D.Pa.1987), *aff'd,* 75 B.R. 819 (E.D.Pa.1987), for the proposition that an equity cushion is more likely to provide a basis for a finding of adequate protection where the debtor's successful reorganization is likely. In *Grant,* the bankruptcy court granted the debtor's § 363 request to use cash collateral. The court found that the secured lienholder enjoyed an equity cushion of about 25%, that the equity cushion was likely to increase rather than to erode, and that there was a strong likelihood of reorganization. Based on these factors, the court concluded that the secured party was adequately protected. The court found that the compensatory payments given in § 361 as an illustration of adequate protection were not required in every case. The court imposed certain conditions on the debtor's use of the funds and expressed its duty "to monitor the progress to the debtor towards reorganization very carefully if the loss of a creditor's security is potentially at stake." *Id.* at 389.

For the converse position, Anchor cited *Huntington Nat'l Bank v. A.K. Fiberglastics, Inc.,* 26 B.R. 549, 552 (Bankr.S.D.Ohio 1983). In a pre-

In the November 3, 1988 order of this court granting a stay pending appeal, the court noted the case of *Margell v. Bouquet Investments*, 32 B.R. 988 (Bankr.E.D.Cal. 1983) in which a bankruptcy court granted relief from the stay. The court heard evidence on the value of the collateral, one piece of raw land, which varied from $133,-000 to $276,000 for the $166,000 debt. In typical stay litigation, a secured creditor wants to liquidate the collateral securing its claim and is only interested in recovering the amount of its debt. Other undersecured or unsecured creditors, whose only hope for payment of their claims may be the successful reorganization of the debtor, may be harmed by the removal of essential property from the estate. *Id.* at 990. Section 362(d)(2) therefore authorizes relief from the stay if the desired collateral is not necessary to an effective reorganization and if the debtor does not have equity in the property. Section 362(d)(1), in the alternative, authorizes relief from the stay "for cause, including a lack of adequate protection." § 362(d)(1), (2).

The *Margell* court assumed that the debtor had equity in the property and found that the property was necessary to an effective reorganization (the two elements of § 362(d)(2)), thus relief could be granted only for cause. The court had not determined specifically the value of the collateral, but merely assumed that the equity element was satisfied so it could move on to the adequate protection analysis. The court held that equity without more was not enough to support the automatic stay.

The court stated that the debtor "should not be permitted to speculate at the [creditors'] expense," *id.* at 989, apparently concerned about the actual value of the collateral (by the creditors' valuation, there was no equity cushion). While the opinion is not clear, it appears that the court felt that relief from the stay was warranted because there were no other creditors to protect, thus obviating the need for the safeguards of section (d)(2). *Margell* is not persuasive in the instant case because, though couched in terms of adequate protection of the objecting secured creditor, the decision actually turned on whether lifting the stay would harm other creditors or the reorganization effort. In the instant case, the issue is whether Anchor, which is greatly oversecured even by the appraisal of its own expert, is adequately protected from the effects of a small senior lien.

Anchor argued that the court should consider the debtor's lack of equity in its property to be evidence that the debtor has not satisfied the adequate protection requirement. In *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396 (9th Cir.1984), the debtors and trustee appealed the bankruptcy court's annulment of the automatic stay. The bankruptcy court had found that the objecting creditor enjoyed an equity cushion of 20% but granted relief from the stay because, considering all liens, the debtors lacked equity in their property. The Court of Appeals reversed, holding that the bankruptcy court erred in considering junior liens in its determination of adequate protection.[6] The court found that an equity

---

liminary order, the court expressed its intention to grant the creditor's motion for relief from the stay under § 362 unless the debtor met certain conditions, including substantial "adequate protection payments" to the creditor. The court stated that a "theoretical 'equity cushion' is only one factor to be weighed and the importance thereof must be diminished in inverse ratio to the likelihood of a consummation of a successful reorganization." *Id.* at 552. While this court accepts that principle, the *Huntington* case is readily distinguishable. In *Huntington* the expert testimony was widely divergent, and only the more "optimistic" appraisals offered by the debtor resulted in an equity cushion. *Id.* By contrast, the equity cushion in the instant case was calculated at 160% when using Anchor's most pessimistic valuations. Accordingly, An-

chor's interest is adequately protected for a few years even if the debtor does not successfully reorganize.

6. Anchor cited *In re Au Natural Restaurant, Inc.*, 63 B.R. 575 (Bankr.S.D.N.Y.1986), for the proposition that the bankruptcy court "erred in placing the burden upon the creditors to show that they were not adequately protected." Amended brief in support of appeal from bankruptcy court order authorizing § 364(d) superpriority financing, p. 21. The *Au Natural* court did set out the requirement that "the debtor must demonstrate that there is adequate protection for the secured party whose lien is being primed," and summarily found that the requirement was not met. The court held that consideration of the motion for superpriority financing was "super-

cushion as to the primed lienholder is the "classic form of protection for a secured debt" and can, standing alone, provide the adequate protection described by § 361.[7] *Id.* at 1400.

■■■ The court is persuaded that § 364(d) does not require that the debtor have equity in its property. The ambiguity arises because, while § 364(d)(2) clearly puts the burden on the debtor-in-possession to demonstrate that there is adequate protection of the primed lienholder, the section is silent as to whether a lienholder may waive the protection. In the instant case, the bankruptcy court considered the adequate protection only of the lienholder which objected to the new senior lien, holding that Anchor lacked standing to argue the adequate protection, *vel non*, of the undersecured lienholders who withdrew their objections to the superpriority lien. Admittedly, because the junior lienholders are already undercollateralized, the authorization of superpriority financing makes their positions even more vulnerable. Each creditor, however, is entitled to seek its own best interest, within the strictures of the bankruptcy code. The fact that those undersecured lienholders either did not object or withdrew their objections to the superpriority financing must mean that they expect to derive some benefit from the transaction. Perhaps each concluded that the superpriority lien would help bring about a successful reorganization or at least increase the value of the collateral, ultimately increasing the amount each will receive on its undersecured claim. The court need not speculate; by tacitly consenting to the superpriority lien, those creditors relieved the debtor of having to demonstrate that they were adequately protected.

Anchor would have this court follow *Weems v. Scandia Builders, Inc. (In re Scandia Builders, Inc.)*, 446 F.Supp. 115 (N.D.Ga.1978), the only case on this subject from this district, in which the district court for the Northern District of Georgia reversed a bankruptcy court's authorization of superpriority financing. The court held that "certificates of indebtedness" imposing a first lien on previously encumbered property were available only when necessary to prevent "catastrophic loss" and to preserve the collateral. *Id.* at 119. Judge Murphy heard argument in the instant case on the applicability of *Scandia* and concluded in the Sept. 12 Order that *Scandia* was inapposite. *Scandia* was decided under Chapter XI of the Bankruptcy Act of 1898 which was not designed to modify the rights of secured creditors. Chapter 11 of the Bankruptcy Code, however, does allow such modification, and § 364(d) provides express statutory authorization for superpriority liens. Anchor argued that the *Scandia* court "in anticipation of the changes in the Bankruptcy code, concluded that bankruptcy courts could subordinate secured creditors' liens under particular circumstances." Amended brief in support of appeal from bankruptcy court order authorizing § 364(d) superpriority financing, p. 16. The *Scandia* court, however, discussed only the powers granted to a bankruptcy court by Chapter XI as it then existed. The court said

the purpose of Chapter XI ... is to provide a quick and economical means of facilitating simple compositions among general [unsecured] creditors.... How-

---

fluous," given its disposition of the § 363 motion to sell assets of the debtor.

**7.** Section 361, titled "Adequate protection," provides:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief ... as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

ever, the Court is reluctant to find that the bankruptcy court is always powerless to subordinate preexisting liens. At common law, courts had inherent, albeit limited, power to subordinate the rights of secured creditors. Those common law equitable powers form the basis for the issuance of first lien certificates in Chapter XI proceedings.

*Id.* at 118. The *Scandia* court could not have been more explicit in identifying the source of the power it was exercising. In the absence of any statutory authority to subordinate existing liens, the court had to reach beyond the structure of bankruptcy. Chapter 11 of the Code, however, expressly provided the authority and the means to subordinate secured interests. Accordingly, Anchor's reliance on *Scandia* for the standard to be used for determining "adequate protection" for § 364(d) is completely unfounded.[8]

■ Anchor also argued that the debtor was attempting to use the § 364(d) first lien as its plan of reorganization while avoiding the strict requirements of § 1129, citing *In re Chevy Devco*, 78 B.R. 585 (Bankr.C.D.Cal.1987). In *Chevy Devco*, the proceeds of the superpriority lien were to be used completely to renovate the shopping center that was the debtor's sole asset, and, therefore, the court viewed it substantially the same as a cramdown situation. The court denied the request because it did not meet the requirements of § 1129(b). *Chevy Devco* is not persuasive in the instant case because the debtor Sky Valley has numerous assets ranging from the resort golf course and ski facility to the time share units and condominiums to the raw land designated for development as single and multiple family homes and commercial development. The proceeds from the § 364(d) lien were to be used to prepare and advertise the condominiums for sale, to improve and maintain the golf course and for administrative expenses. The superpriority lien did not affect all of the debtor's assets or all of its creditor's. The bankruptcy court found that the request for a lien was not a camouflaged plan of reorganization, and this court agrees. Accordingly, it is not necessary to test the lien proposal against the confirmation requirements of § 1129.

Having reviewed the available authority, and having concluded that an equity cushion can, under the facts of a case, provide a secured creditor the adequate protection required by § 364(d), and having found that the sizeable equity cushion enjoyed by Anchor in fact will adequately protect Anchor's interest for at least a few years, the court is compelled to affirm the order of the bankruptcy court. The court remains gravely concerned that Anchor is losing a priority status for which it bargained. The court has reluctantly concluded that such a loss of priority is an inevitable by-product of a § 364(d) first lien—some creditor which bargained for its first priority position will always be nudged aside. No cases found indicated that the loss of the first priority status constituted a lack of adequate protection.[9] As Judge Murphy pointed out in her order of September 23, 1988, denying a stay pending appeal, "it is unlikely that Congress would have included § 364(d) and (e) in the Bankruptcy Code if it considered the loss of a first priority position, irrespective of adequate protec-

---

**8.** Anchor cited *In re Dunckle Assoc., Inc.,* 19 B.R. 481 (Bankr.E.D.Pa.1982) as a decision under the new Code which followed the standard set by *Scandia.* The *Dunckle* decision, however, turned on the fact that the request for a superpriority lien was made by a *secured creditor* for the purpose of winterizing the debtor's assets, while § 364(d) contemplates first lien expenditures only by the trustee or debtor-in-possession. Accordingly, *Dunckle* is inapposite to the instant case.

**9.** Anchor cited *In re St. Petersburg Hotel Assoc., Ltd.,* 44 B.R. 944 (Bankr.M.D.Fla.1984) for the proposition that any benefit the mortgagee derived from the § 364(d) lien was insufficient to compensate it for the loss of its first priority position. In *St. Petersburg,* however, the secured party was already undercollateralized, and the court found that the debtor's assumptions were highly speculative and unrealistic. The additional encumbrance would have seriously deteriorated the creditor's already precarious position, while the chance that the use of the funds would substantially benefit the mortgagee was slim.

**124**

tion was, *ipso facto*, irreparable harm." Order of September 23, 1988, p. 7.

At subsequent stages in this bankruptcy case, the bankruptcy court must continue to ensure that the interests of the secured creditors are adequately protected.[10] In particular, the bankruptcy court should carefully test any reorganization plan submitted by the debtor against the requirements of § 1129(b)(2).

In accord with the discussion herein, the September 12, 1988 order of the bankruptcy court is hereby affirmed.

IT IS SO ORDERED.

---

**10.** *See, In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 376, 389 (Bankr.E.D.Pa.1987), *aff'd,* 75 B.R. 819 (E.D.Pa.1987).