In re DUNES CASINO HOTEL, a New Jersey Partnership, Debtor.

Bankruptcy No. 85–04270.

United States Bankruptcy Court, D. New Jersey.

Dec. 31, 1986.

Crummy, Del Deo, Dolan, Griffinger & Vecchione by Frank J. Vecchione, Newark, N.J., for debtor.

Jackson & Crow by Charles S. Crow, III, Princeton, N.J., Special Counsel to debtor.

Ravin, Sarasohn, Cook, Baumgarten, Fisch & Baime by Jonathan I. Rabinowitz, Roseland, N.J., for the Unsecured Creditors' Committee.

Stryker, Tams & Dill by Stephen D. Cuyler, Mark F.C. Berner, Newark, N.J., for San Antonio Sav. Ass'n.

Joseph A. Lazarow, Matthew H. Powals, for the City of Atlantic City.

## OPINION

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

Before the court are two matters: (1) a Notice of Motion by San Antonio Savings Association (SASA) for modification of the automatic stay pursuant to 11 U.S.C. § 362(d) to permit SASA to institute foreclosure proceedings on its mortgage against certain property of the debtor-in-possession, and; (2) a Notice of Motion by Dunes Casino Hotel, a New Jersey partnership, the debtor-in-possession (debtor), for an order pursuant to 11 U.S.C. § 364(d) authorizing the debtor to incur indebtedness secured by a senior lien on certain real property of the estate that is the subject of an existing lien held by SASA. For the reasons to follow, the court will deny the motion to SASA to modify the automatic stay and grant the debtor's motion for financing under § 364(d).

The debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 (Bankruptcy Code) on August 9, 1985. The debtor has continued in possession of its property and in the operation of its business, the development of a casino hotel in Atlantic City, New Jersey. The debtor is indebted to SASA in the principal amount of $14,900,000.00 plus accrued interest. According to the Certification of Velma Jeanne Rzezrik, assistant vice-president of SASA, dated April 21, 1986, accrued interest from December 1, 1984 to April 1, 1986 is $2,763,900.69, for a total debt of $17,663,900.69 exclusive of attorneys' fees. As of that date, the debt was accruing interest at a per diem rate of $5,715.07. The indebtedness is evidenced by a promissory note dated July 27, 1983 and secured by a mortgage dated July 27, 1983. SASA's mortgage is a first mortgage on three parcels of real estate in Atlantic City, New Jersey, which property the debtor plans to utilize in the development of its casino hotel project and a tract of land in Egg Harbor Township, New Jersey, which is not part of the debtor's casino hotel project.

The debtor owns and operates the Mayfair Hotel which is situated on the mortgaged property in Atlantic City, New Jersey.

SASA, by its motion, asserts that: (1) SASA does not have and has not been offered adequate protection of its interest in the subject real property; (2) the debtor does not have equity in the real property; (3) the debtor has no reasonable prospect for reorganization, and; (4) SASA will suffer irreparable harm if it is not permitted to institute its foreclosure action. SASA originally requested entry of an order: (1) adjudicating that SASA has a valid first lien on the property described in its mortgage; (2) permitting SASA to foreclose upon the mortgage and sell the subject property; (3) modifying the stay of § 362(a) to permit the foregoing, and; (4) other and further relief as just and proper.

At the hearing conducted before this court on July 11, 1986, SASA stated that it sought modification of the stay to commence foreclosure proceedings up to judgment but not including execution or sale of the collateral. The debtor does not dispute the first lien of SASA, but opposes any modification of the automatic stay and requests dismissal of the motion on the grounds that: (1) SASA's interest in the real property subject to the mortgage is adequately protected under 11 U.S.C. § 362(d)(1); (2) the debtor has substantial equity in the real property under 11 U.S.C. § 362(d)(2) and SASA has failed to carry its burden of proof on the issue of the debtor's lack of equity under § 362(g)(1), and; (3) the real property is necessary to an effective reorganization of the debtor under § 362(d)(2).

The debtor requests that this court enter an order authorizing it to obtain credit and to incur debt secured by a senior lien pursuant to 11 U.S.C. § 364(d) on the subject real property as follows: (1) the sum of $372,000.00 secured by a senior lien on the Egg Harbor, New Jersey parcel, and; (2) the sum of $325,000.00 secured by a senior lien on the Atlantic City, New Jersey properties.

The Unsecured Creditors' Committee opposes SASA's motion for modification of the stay on the basis that SASA has failed to meet its burden under § 362(d)(1) and (d)(2).

The Unsecured Creditors' Committee also supports the debtor's application for priority borrowing. The Unsecured Creditors' Committee represented to this court that it was satisfied that the debtor has made progress in connection with its reorganization efforts and that a proposed plan of reorganization has been submitted to the Unsecured Creditors' Committee for its review in anticipation of the debtor filing a plan by August 4, 1986.

The City of Atlantic City appeared to support the debtor's application for financing, particularly in regard to the proposed repairs to the Mayfair Hotel. The City of Atlantic City took no position on SASA's application for modification of the automatic stay.

Both the debtor and SASA have filed and submitted for the court's consideration herein appraisals of the subject property. For ease of reference, the court will refer to the properties as follows:

(1) Property located in Atlantic City, New Jersey, consisting of approximately 64,000 square feet with an improvement consisting of structural steel (Parcel "A");

(2) Property located in Atlantic City, New Jersey, consisting of 27,000 square feet with the improvement of the apartment house known as the Mayfair Apartment (Parcel "B");

(3) Property located in Atlantic City, New Jersey, consisting of 50,000 square feet, unimproved (Parcel "C")[1];

(4) Property in Egg Harbor, consisting of four unimproved acres ("Egg Harbor Parcel");

1. This property is unimproved and currently utilized for parking. It is scheduled to be the future site of the Mayfair II apartments. It is the debtor's intention to retire the present May-

fair Apartments and utilize that space for its casino project. The debtor intends to construct a new housing facility, the Mayfair II, on Parcel C.

(5) The Albany Avenue Extension ("Albany Avenue"), and [2];

(6) The "Golden-Nugget" parcel which is the subject of an agreement between GNAC Corp. and the debtor ("G–N Parcel") [3].

The mortgaged property consists of Parcels A, B & C and the Egg Harbor property.

SASA's appraisals, dated February 22, 1986, were performed by the firm of Brody-Chaiken-Izenberg & Associates (Brody-Chaiken). These two separate appraisals cover the debtor's Atlantic City properties and the Egg Harbor parcel. The Brody-Chaiken appraisal for the Atlantic City properties sets forth market value defined as "the highest price estimated in terms of money which a property will bring if exposed for sale in the open market allowing a reasonable time to find a purchaser who buys with knowledge of all the uses to which it is adapted and for which it is capable of being used."

The Atlantic City properties were valued as of February 22, 1986 by Brody-Chaiken utilizing the Market Data Comparative Approach, which analyzes actual similar sales. The properties were valued under two different scenarios. Scenario 1 assumes that the greater tract can be considered available for a casino-hotel development, its highest and best use, by the satisfaction of various conditions including: (1) site plan approvals from the Atlantic City Planning Board; (2) final approval from the Coastal Area Facilities Review Agency (CAFRA); (3) satisfactory maintenance of the existing Mayfair Apartments; (4) acquisition of Albany Avenue property; (5) permanent maintenance of housing subsidies in connection with the Mayfair II; (6) acquisition of the Golden Nugget Parking Lot tract, and; (7) qualification for a casino license. Scenario 2 assumes that these conditions could not be met and that the individual parcels would revert to certain uses.

Under Scenario 1 (greater tract available for casino-hotel development), SASA's appraiser assigned a value for the Atlantic City properties of $54,090,000.00, arrived at as follows:

| | | |
|---|---|---|
| Parcels A, B, G–N and Albany Avenue—Casino site 209,600 sq. ft. × $275/sq. ft. | = | $57,640,000.00 |
| Parcel C—Residential site 50,000 sq. ft. × $200/sq. ft. | = | $10,000,000.00 |
| Total Land Value | | $67,640,000.00 |
| Less Cost of "Assemblage" or Unifying Conditions" | | ($13,550,000.00) |
| | | $54,090,000.00 |

Under Scenario 2 (if all conditions under the appraisal for availability of the greater tract for casino-hotel development could not be satisfied) SASA's appraiser assigned the following values to the Atlantic City properties:

| | |
|---|---|
| Parcel A— 64,000 sq. ft. × $200 sq. ft. = | $12,800,000.00) |
| Raze Steel Structure | ($ 300,000.00) |
| | $12,500,000.00 |
| Parcel B— 27,000 sq. ft. × $200 sq. ft. = | $ 5,400,000.00 |
| Mayfair I Repairs | ($ 1,250,000.00) |
| Operational Losses | ($ 1,000,000.00) |
| | $ 3,150,000.00 |
| Parcel C— 50,000 sq. ft. × $200 sq. ft. = | $10,000,000.00 |
| Albany Avenue—Owned by Atlantic City | — no value |
| G–N Parcel—revert to GNAC Corp. | — no value |
| TOTAL | $25,650,000.00 |

The Brody-Chaiken appraisal for the Egg Harbor Parcel sets forth Market Value defined as "the most probable price in terms of money which a property should bring in competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus." Using the same Market Data Comparative Approach the appraisal assigns the Egg Harbor parcel a value as of February 22, 1986 of $550,000.00. Accordingly, under Scenario 1 (greater Atlantic City tract available for

---

**2.** This property refers to a section of Albany Avenue in Atlantic City, New Jersey, which the City of Atlantic City has agreed to vacate and which the debtor intends to combine with its other properties for an improved casino site for the Dunes Casino Hotel.

**3.** This property, owned by GNAC Corp., is currently under a contract to purchase by the debtor.

casino-hotel development) the combined value of the mortgaged properties is $54,640,-000.00. Under Scenario 2 (greater Atlantic City tract not available for casino-hotel development) the combined value of the mortgaged properties is $26,200,000.00.

Brody-Chaiken, by a supplemental appraisal analysis dated May 9, 1986, states that in the appraiser's opinion Scenario 1 is so "remote and unlikely" an event that the appraiser believes that the valuation shown for Scenario 2 represents Market Value for the Atlantic City properties.[4]

The debtor has submitted an appraisal on its behalf conducted by M. Richard Cohen. The appraisal, dated July 1, 1986, estimates the fair market value of the Dunes Casino Hotel site as of June 1, 1986. Fair market value is defined as "the price which a well informed buyer acting intelligently, voluntarily and without necessity would be warranted in paying and a well informed seller acting intelligently, voluntarily and without necessity would be warranted in accepting for the property as of a certain date." The debtor's appraiser has also employed the market data approach considering similar land sales. The debtor's appraisal considers two distinct cases. In the first case, the fair market value of the property, assuming settlement on the G–N Parcel and vacation of Albany Avenue, and in the second case the value of the property assuming the G–N settlement does not take place and Albany Avenue is not vacated.

In case one, assuming the development of the entire Atlantic City assemblage, involving casino development east of Roosevelt Place (Parcels A, B, G–N and Albany Avenue) and residential development west of Roosevelt Place (Parcel C), the value of the land is stated to be $67,-500,000.00, consisting of:

| | |
|---|---|
| Parcels A, B, G–N and Albany Avenue—Casino site 209,600 sq. ft. × $275/sq. ft. | = $57,640,000.00 |
| Parcel C—Residential site 50,000 sq. ft. × $200/sq. ft. | = $10,000,000.00 |
| | $67,640,000.00 |

In case two, assuming the demolition of the Mayfair and the availability of 91,000 square feet of property with casino zoning available for development, the value of the property according to the Cohen appraisal would be $35,000,000.00, consisting of:

| | |
|---|---|
| Parcels A, B, Casino site 91,000 sq. ft. × $275/sq. ft. | = $25,000,000.00 |
| Parcel C—Residential site 50,000 sq. ft. × $200/sq. ft. | = $10,000,000.00 |
| | $35,000,000.00 |

The court is presented by SASA's appraiser with a "worst case" valuation for the subject mortgaged properties based on the Brody-Chaiken appraisal, of $26,200,-000.00. It is noted herein that in the Brody-Chaiken appraisal, the existing steel structure on Parcel A was assigned little, if any, net value to that parcel and that under Scenario 2, the value of Parcel A was discounted by $300,000.00 estimated necessary to raze the steel structure. The debtor's appraisal on the other hand notes that a purchaser of Parcel A would have the benefit of $8,500,000.00 worth of structure and foundation work as a "bonus."

Richard M. Chaiken, a member of the firm of Brody-Chaiken, in a deposition conducted on June 18, 1986, admitted that in valuing Parcels A and B for Scenario 2 he did not take into account that the property met the minimum zoning requirements of two acres for casino development, although he further stated that he would assume under that set of facts an investor would have to have some other land for the rest

---

4. By letter to counsel for SASA dated May 9, 1986, Richard M. Chaiken of Brody-Chaiken stated that he based this conclusion upon his own review of the summary of the oral testimony of Marvin Hoffman, SASA's expert witness, dated May 7, 1986 and Mr. Hoffman's conclusions that Mr. Jack Bona, the principal of the debtor, could not develop the site in question because the debtor does not have an experienced management team in place, Mr. Bona is of questionable licensability due to certain financial and legal difficulties and that the debtor has "no chance" of raising the necessary funds to complete the Chapter 11 reorganization.

of the casino development. He further admitted that in valuing the Atlantic City properties under Scenario 2, assuming that Parcels A and B could be joined and utilized as a casino hotel and Parcel C was available for parking, the value which Mr. Chaiken assigned these parcels of $200.00 per square foot would increase to $220.00 to $225.00 per square foot. Mr. Chaiken in his deposition also stated that if there were an engineering survey that indicated some or all of the steel situate on Parcel A could be used and there existed a net savings that the typical investor would be willing to rely upon, his opinion as to the value of the steel would change.

Mr. Jack Bona testified before this court on July 11, 1986. Mr. Bona is the principal of Queens Ventures, Inc. and Venture Development, Inc., the two corporate partners of the debtor. Mr. Bona testified to the fact that except for the SASA mortgage, there is one mortgage on a portion of Parcel C held by Roseanna Corporation with a principal balance of $150,000.00. Mr. Bona testified that he, on behalf of the debtor, is in the process of preparing a plan of reorganization to be filed with this court and that the properties which are the subject of these applications are needed as part of the debtor's plan insofar as they represent the debtor's major asset. Bona stated that the debtor intends to utilize the properties to develop a casino-hotel but also stated that if the casino-hotel cannot be developed, the properties can be developed for other purposes pursuant to a Chapter 11 plan.

Mr. Bona also testified that the structural steel referred to in the appraisers' reports was in place in April 1983 when Bona first became affiliated with the Dunes casino project. The steel was for the construction of the original design of the casino, which design has since been abandoned by the debtor. Bona testified that the steel was tested in 1983 and that as a result of engineering and architectural reports done at that time, the debtor is satisfied that the steel could be used in a future design. In 1983 and 1984, the debtor expended approximately $250,000.00 to sandblast, paint and rustproof the steel and reinforce some portions of the steel structure.

Mr. David Jacobson, an architect who provided design and consulting services on the Dunes Casino project also testified. He testified that studies done in 1983 by him indicated that the redesigned casino project utilizing Parcels A, C, G–N and Albany Avenue could utilize the steel foundation and pilings already in place on Parcel A and was incorporated into the current design. Jacobson also testified that the steel and pilings had value for other casino designs or non-casino residential uses.

Mr. Bona testified that under the worst case analysis as proposed by the SASA appraisal, the only costs to the debtor would be the closing of the Mayfair Apartment building and its demolition. He stated that the Mayfair I repairs of $1,250,-000.00 and the operational losses of $1,000,-000.00 cited in the Brody-Chaiken appraisal would not be required. He agreed that the demolition cost of $500,000.00 to raze the Mayfair Apartments contained in the Brody-Chaiken appraisal would be a cost that the debtor would have to absorb under Scenario 2.

Mr. Bona, by testimony before this court and affidavits presently filed with this court dated September 9, 1985, October 24, 1985, February 1, 1986 and May 7, 1986, indicate that the debtor is continuing to pursue several avenues for raising the necessary funds to finance a plan of reorganization. In connection therewith, the debtor has embarked upon securing letters of intent with contractors in the building trades and a public offering of securities. The public offering of limited partnership interests was filed with the Security Exchange Commission and became effective April 11, 1986. Pursuant to the offering, a limited partnership known as Casino Development, Ltd. would be created to own the Dunes Casino Hotel. That partnership would consist of a general partner, Casino Development, Inc., a corporation owned by Bona, and a group of limited partners. A total of one million units will be made available to limited partner investors at $100.00 per

unit, representing up to 50 percent ownership of the project. The proceeds of all sales will be held in escrow until a minimum level of $55 million is received. The $55 million is proposed to be utilized to close with GNAC on the G–N parcel, satisfy the SASA mortgage requirements and pay 100% to unsecured creditors. The prospectus is a minimum/maximum offering under the terms of which the first $55,000,-000.00 will be placed in escrow and released only if that amount is raised.

Mr. Bona testified that the debtor seeks to borrow funds from First Wall Street Capital Corporation under § 364(d). The loan would be a one-year loan with interest payable semi-annually at a rate of 15% with a right of prepayment. Mr. Bona testified that he has attempted to borrow funds both on a unsecured basis and secured by a lien on the subject real property subject only to existing liens and has so contacted banks and private investors. Bona testified that these banks and investors, including First Wall Street Capital Corp., Midlantic National Bank, and an individual investor, one Mr. DeSanza, were willing to advance funds only if they got a first lien position.

Mr. Bona testified that in regard to the $372,000.00 loan proposed to be secured by a senior lien on the Egg Harbor parcel, $150,000.00 is to be used to make interim repairs to the Mayfair Apartment building, and to put up sidewalk scaffolding, $25,-000.00 is to be used for deferred maintenance of the Mayfair principally for the boiler, $12,000.00 for elevator repairs, $5,000.00 to reopen the lobby of the Mayfair, $75,000.00 for projected operating deficits in the Mayfair operation for the next five months (calculated at $15,000.00 per month). Mr. Bona testified that these operating deficits are the result of several factors, including a decrease in the hotel's occupancy rate. Bona also testified that $100,000.00 was needed to market the public offering pursuant to which the debtor is acting as the underwriter. These funds would be used for advertising, seminars, and hiring persons to be in contact with brokers.

Mr. Bona testified that the loan of $325,-000.00 to be secured by a senior lien on the Atlantic City properties is to be used to pay real estate taxes to the City of Atlantic City. Counsel for the debtor stated at trial that the debtor is seeking at this time the authority to borrow funds to pay post-petition taxes only.

SASA presented the testimony of Marvin B. Roffman, a securities analyst with the firm of Janney, Montgomery, Scott, specializing in the casino stock industry. Roffman stated that the location of a casino is important to its marketability and that recent trends indicate that casinos in the southwestern end of the Atlantic City boardwalk, where the Dunes Casino site is located, have been experiencing declines in gross operating revenues over the past 2 years while the industry in general in Atlantic City has been going in the opposite direction. Roffman testified that in his opinion, with the proposed opening of two new casinos in 1987 on the other side of the boardwalk, the Showboat and Resorts International II, action will be shifted away from the proposed Dunes site. Roffman testified that given the development of the Showboat and Resorts II, and the number of parking spaces the Dunes assemblage can support (1,200 in comparison to the 5,000 available for Showboat and Resorts II) the Dunes site is relatively undesirable. Roffman testified that in his opinion these problems would impact on the securities marketing effort by the debtor. Roffman testified that his review of the Dunes offering prospectus indicated that casino revenue figures stated in the prospectus were based upon 1983 figures and exclude the figures for 2 casinos, the Atlantis Casino and the Claridge Casino, which had losses for that period. Roffman explained that the revenue projections were based upon a profit stream of approximately $180 million in 1983 from eight casinos, which compared to a $51 million profit from eleven casinos in 1985. Roffman also testified that the market for securities in the casino gaming industry at the present time is "terrible."

Roffman stated that with the minimum of $55 million in the public offering necessary to break escrow going to the retirement of the debtor's existing debt obligations there would not be sufficient working capital for the casino hotel project. Roffman testified that the chance of obtaining financing for the casino project, which he estimated at over $300 million, with no management team in place and no casino license in place was "zero" and that he would not advise a client to invest in this project. He further stated that in his opinion a prospectus without a "legitimate" underwriter would have no meaningful after market in a stock.

Roffman admitted, however, that the investment community does not know what the economic conditions are going to be six months from now or three years from now.

The court, for purposes of this application, accepts the premise that the casino development project may fail and in fact has viewed the applications on a "worst case" basis.

The court notes that the "worst case" scenario may be better than SASA's appraiser concluded. Taking into account the utilization of the steel structure on Parcel A, rather than its razing, the value of Parcel A would be $12,800,000.00 (not $12,500,-000.00 obtained by deducting the $300,-000.00 estimated to raze the steel structure). In determining the value of Parcel B and taking into account the demolition of the existing Mayfair, "repairs" estimated at $1,250,000.00 and operational losses of $1,000,000.00 may not be relevant, and accepting demolition costs for the Mayfair of $500,000.00, the value of Parcel B may more properly be $4,900,000.00 rather than $3,150,000.00. It is clear that Brody-Chaiken in valuing A, B and C assumed the following as contained in its appraisal report: "Parcel B would have no independent use and the low-income housing would be such a liability as to make this parcel value-

less. Parcel A would be limited to assemblage or parking or perhaps a Luxury-Water-Front Condominium. Parcel C would have an independent use as a condo development available for development in accord with zoning." Assuming, however, the prospect of casino development on the site, and an incremental change of $25 per square foot, the values of Parcel A and B could result in additional value of $2,275,-000.00. Adding the $10,000,000.00 value for Parcel C and the $550,000.00 value for the Egg Harbor Parcel, the total worst case valuation could be adjusted from $26,-200,000.00 to $30,525,000.00.[5]

This court will first address SASA's motion to modify the automatic stay.

Title 11 U.S.C. § 362(d) of the Bankruptcy Code provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property under subsection (a) of this section of such party in interest; or
>
> (2) with respect to a stay of an act against property, if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization.

In seeking relief from the automatic stay, the creditor has the burden of proof on the issue of the debtor's equity in the collateral, with the debtor having the burden of proof on all other issues, including adequate protection. 11 U.S.C. § 362(g).

■ Turning first to § 362(d)(2), it is clear that both elements of § 362(d)(2) must be satisfied to entitle a creditor to relief from the stay. *See, e.g., In re Bia-*

5. Computed as follows:

Parcels A & B

| | | |
|---|---|---|
| 91,000 sq.ft. × $225/sq.ft. | = | $20,475,000.00 |
| Raze Mayfair I | | ($ 500,000.00) |
| | | $19,975,000.00 |

Parcel C

| | | |
|---|---|---|
| 50,000 sq.ft. × $200/sq.ft. | = | $10,000,000.00 |
| Egg Harbor Parcel | | $ 550,000.00 |
| | | $30,525,000.00 |

*lac,* 712 F.2d 426 (9th Cir.1983); *In re Trina-Dee, Inc.,* 26 B.R. 152 (Bkrtcy.E.D. Pa.1983).

In determining whether or not the debtor has equity in the property, all encumbrances against the subject property are totalled, whether or not all of the lien holders have joined in the request for relief from the stay. *See In re Trina-Dee, Inc.,* 26 B.R. 152, 154 (Bkrtcy.E.D.Pa.1983). It was the opinion of SASA's appraiser that the market value of the Atlantic City property was $54,090,000.00, assuming the greater tract was available for casino-hotel development, and the market value of the Egg Harbor property was $550,000.00 for a total value of $54,640,000.00 and that under a "worst case" analysis, the value of the Atlantic City properties was $25,650,000.00 plus the Egg Harbor parcel valued at $550,000.00 for a total value of $26,200,-000.00. The debtor's appraisal indicates an optimum value for the Atlantic City properties of $67,640,000.00 and a minimum value of $35,000,000.00.

In evaluating these reports, the court notes that even accepting the worst case analysis as contained in SASA's appraisal of $26,200,000.00, there exists equity in the property above the SASA lien, taking into account the Roseanna Corp. mortgage ($150,000.00) and unpaid real estate taxes owing to the City of Atlantic City on the subject properties, which according to the Report of Delinquent Real Estate Taxes as of June 1986, exclusive of taxes due July 1, 1986 or interest accrued through June 1986 are in the total sum of $483,766.68.

Thus, by SASA's own appraisal of $26,-200,000.00 and considering its debt as of April 1, 1986 of $17,663,900.69, the debtor has substantial equity over all the encumbrances on the properties and the motion of SASA under § 362(d)(2) must fail. Accordingly, the court need not address whether the property is necessary to the debtor's effective reorganization under § 362(d)(2). *See In re Bialac, supra,* 712 F.2d at 432.

The court notes in any event that the testimony of Jack Bona makes clear that the real property which is subject to SASA's mortgage is necessary to the effective reorganization of this debtor whether through the development of the Dunes Casino Hotel project or the sale or use of the debtor's property for other purposes.

SASA alternatively may be entitled to relief from the automatic stay under 11 U.S.C. § 362(d)(1) if SASA's interest in the property is not adequately protected.

Section 361 provides:

When adequate protection is required under section 362, 363 or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

Adequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy. *See In re Coors of the Cumberland, Inc.,* 19 B.R. 313, 321 (Bkrtcy.M.D.Tenn.1982).

Although the concept of adequate protection is intended to protect a creditor's interest in the collateral, it is susceptible to differing applications over a wide range of factual situations. The House Report states that adequate protection:

is not intended to be confined strictly to the constitutional protection required, however. The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interests. Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.

H.R.Rep. No. 595 at 339, 1978, U.S.Code Cong. & Ad.News at 5787, 6295.

The Ninth Circuit in the case of *In re American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir.1984) interpreted Sections 361 and 362(d) to require that the undersecured creditor in that case be compensated for delay in enforcing its rights during the interim between the debtor's filing of its Chapter 11 petition and confirmation of the plan, and that one way of providing such adequate protection was the payment of monthly interest payments at the market rate on the liquidation value of the collateral. *Id.* at 435. The *American Mariner* court, however, clearly stated:

We agree that this is one method of providing adequate protection but by no means the only method available to the debtor. Consistent with the policies behind section 361 and 362, the debtor should be permitted maximum flexibility in structuring a proposal for adequate protection. The result, however, should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights.

734 F.2d at 435.

The Eighth Circuit Court of Appeals in the case of *In re Briggs Transportation Company*, 780 F.2d 1339 (8th Cir.1985) re-jected the notion that adequate protection mandates an interpretation of the creditors' interest as the whole of the economic bargain to insure that creditors receive the equivalent of what they would have received had no bankruptcy action been filed. The court so noted:

Sections 361(1) and 361(2) specifically provide protection for a decrease in the value of the creditor's interest in such property through section 361(1)'s periodic payments to compensate for depreciation and section 361(2)'s additional or replacement lien to the extent of the decrease in value or actual consumption of the property involved. *See* S.Rep. No. 598 at 54, 1978 U.S.Code Cong. & Ad.News at 5840. Sections 361(1) and 361(2) are drafted to address the collateral's depreciation or decline in value during the pendency of the stay. These provisions are coupled with the grant of other relief as will result in realizing the indubitable equivalent of the creditor's interest on which the creditors focus here. *See* 11 U.S. C.A. § 361(3). This statutory scheme indicates that adequate protection is intended to encompass a broad range of creditor interests and does not mandate an interpretation of the creditors' interest as the whole of the economic bargain.

*Briggs*, 780 F.2d at 1345.

The existence of equity above the secured party's interest which provides an "equity cushion" to the secured party may, in a given case, provide adequate protection. *See, e.g., In re Mellor*, 734 F.2d 1396, 1400 (9th Cir.1984); *In re Palmer River Realty, Inc.*, 26 B.R. 138, 141 (Bkrtcy.D.R. I.1983).

Equity cushion has been defined as the value of the property above the amount owed to the creditor with a secured claim, that will shield the interest from loss due to any decrease in the value of the property during the time the automatic stay remains in effect. *See, e.g., In re Mellor*, 734 F.2d 1396, 1400 n. 2 (9th Cir.1984); *In re Roane*, 8 B.R. 997, 1000 (Bkrtcy.E.D.Pa.), *aff'd*, 14 B.R. 542 (E.D.Pa.1981).

The court notes that some courts have rejected the equity cushion analysis as alien to the concept of adequate protection. *See Matter of Bouquet Investment,* 32 B.R. 988, 9 C.B.C.2d 715 (Bkrtcy.C.D.Cal. 1983); *In re Alyucan Interstate Corp.,* 12 B.R. 803 (Bkrtcy.D.Utah 1981).

Those courts, however, have employed the notion of impairment of lien:

> The cushion analysis, by focusing on the ratio of debt to collateral, obscures the purpose of adequate protection, viz., to guard against impairment of a lien. This blurring of objectives may produce improper results. If Bankers Life had been undersecured at the petition, for example, the absence of cushion would have dictated relief from the stay, even though the stay did not impair its lien and notwithstanding the usual appreciation in the value of realty.

*In re Alyucan Interstate Corp.,* 12 B.R. at 810.

Under either analysis the interest of SASA in the real property is adequately protected. SASA's equity cushion based upon a debt of $17,663,900.69 and collateral valued on a worst case basis at $26,200,-000.00 and recognizing that real estate taxes are owing to the City of Atlantic City through June 1986 in the amount of $483,-766.68, is *at least* $8,000,000.00.[6] There was no evidence that the property is depreciating in value. If SASA foreclosed today, it would be completely protected. With interest accruing at a rate of approximately $2,000,000.00 per year on SASA's mortgage it would take several years for the equity cushion to fully erode.

■ This court is not determining that SASA should wait that long. This court, however, must balance the interest of SASA against that of the debtor and its unsecured creditors. The debtor should be allowed the opportunity to reorganize so that it can make its other creditors whole as well. In balancing the respective harm,

the court finds no substantial harm to SASA's interest in the property in allowing the debtor additional time to rehabilitate. *See, e.g., In re Carson,* 34 B.R. 502, 506 (D.Kan.1983).

If the concept of adequate protection is deemed to protect the value of the creditor's lien from depreciation, the existence of the substantial equity cushion in this case provides such protection.

■ Accordingly, the court will deny SASA's motion for modification of the stay under § 362(d)(1). The court notes that SASA's request for modification of the stay to commence foreclosure proceedings up to judgment but not execution or sale as opposed to the vacation of the stay to sell the property does not lessen its burden of proof under § 362(d).

This court will now turn to the debtor's request for financing.

Section 364(d) provides:

(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

> (A) the trustee is unable to obtain such credit otherwise; and

> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

Under the Bankruptcy Code, a debtor-in-possession, has the rights, powers and duties of a trustee. 11 U.S.C. § 1107.

Section 364(d)(1)(B) requires that adequate protection be provided to the secured creditor whose lien will be subordinated by a superpriority lien.

---

**6.** SASA in its brief filed on July 11, 1986 in support of its motion to modify the stay and in opposition to the debtor's application for financing states that the debtor owes the Township of Egg Harbor $5,308.53 in delinquent taxes through the first half of 1986. Considering this obligation, an equity cushion as set forth herein of at least $8,000,000.00 still exists.

■ The equity cushion analysis employed by this court in connection with the motion of SASA for relief from the stay is equally applicable to adequate protection analysis· employed by courts under § 364(d). *See e.g., In re Snowshoe Company, Inc.*, 789 F.2d 1085 (4th Cir.1986); *Matter of Stanley Hotel, Inc.*, 15 B.R. 660 (D.Colo.1981); *Matter of Stratbucker*, 4 B.R. 251 (Bkrtcy.D.Neb.1980).

■ This court finds based on the testimony of Mr. Jack Bona, that the debtor-in-possession has made an effort to obtain credit on an unsecured basis or on the basis of granting a lien subject to existing liens, and that such financing was not available under those terms. This court further finds based upon the equity cushion analysis stated above, that SASA is adequately protected by the value of the real property which significantly exceeds the liens against it.

■ SASA did not dispute the debtor's use of funds for repair of the Mayfair or for the payment of the real estate taxes on the Atlantic City properties. It is clear that payment of the taxes will in fact enure to the benefit of SASA since the taxes constitute a lien on the property. This court finds that those expenditures are proper and necessary ones. SASA did, however, object to the proposed use of $75,000.00 for projected operating deficits in connection with the debtor's operation of the Mayfair and $100,000.00 for the marketing and promotion of the debtor's public offering. These funds are part of the sum of $372,000.00 to be secured by a senior lien on the Egg Harbor parcel.

This court is satisfied that the use of $75,000.00 to cover projected operating deficits at the Mayfair is proper. These funds are to be used to cover anticipated deficits in the debtor's operation of the Mayfair Hotel, which Bona estimated to be $15,000.00 per month for the next five (5) months.

■ SASA objects to the request for $100,000.00 to be secured by a senior lien on the Egg Harbor property to market its public offering. SASA's position is that the market for such securities is highly speculative and in fact there is no chance of success and that the request constitutes a "mere expectation" which should not be approved by the court. SASA here relies upon the case of *Matter of St. Petersburg Hotel Associates, Ltd.*, 44 B.R. 944 (Bkrtcy.M.D.Fla.1984). In that case, the bankruptcy court denied a motion of the debtor to borrow $1,200,000.00 on a superpriority basis to complete improvements required to obtain a franchise for its hotel. The application was denied on the basis that the mortgage was already undercollateralized and a finding by that court that certain assumptions relied on by the debtor including its ability to repay the principal sum within 5 years was speculative and unrealistic. That court noted "to permit the debtor to saddle this property with an additional encumbrance which is superior to the interest of the Mortgagee would clearly operate to further deteriorate the position of the Mortgagee." 44 B.R. at 946.

This is not the situation in the case at bar.

Firstly, the significant equity in this property precludes a finding that an expenditure of $100,000.00 will deteriorate this mortgagee's position. Moreover, it is clear from this court's review of Mr. Roffman's testimony that the vagaries of the casino industry are such that even expert opinions are necessarily based on speculation. The court believes it is premature at this time to sound the death-knell for the debtor's public offering. The funds are clearly necessary to assist the debtor in its marketing program.

Accordingly, the court will approve the debtor's application to incur indebtedness by a senior lien on the subject real properties in its entirety.

The court, however, will require that the debtor render monthly accountings to SASA, the Unsecured Creditors' Committee and the City of Atlantic City of draw-downs on the loans, expenditures made and repay-

ments made to First Wall Street Capital Corp. under any loan agreement.

An order was entered by this court on July 25, 1986 consistent with this opinion.