**In re WINDSOR HOTEL, L.L.C., Debtor.**

**No. 03–81569.**

United States Bankruptcy Court, C.D. Illinois.

June 19, 2003.

Todd A. Osbron, Aurora, IL, for Debtor.

Thomas J. Pastrnak, Moline, IL, for Northwest Bank.

Richard E. Barber, Galesburg, IL, for the City of Galesburg.

Mark Skaggs, Peoria, IL, for 1st Insurance Funding.

Barry M. Barash, Galesburg, IL, for East Moline Glass.

## OPINION

THOMAS L. PERKINS, Bankruptcy Judge.

This matter came before the Court on the Debtor's Emergency Motion to Obtain Secured Credit secured by a superpriority lien and the motion of NORTHWEST BANK & TRUST COMPANY (NORTH-WEST), to prohibit the use of cash collateral.

The Debtor, WINDSOR HOTEL, LLC (DEBTOR), filed a Chapter 11 petition on March 28, 2003. The DEBTOR operates a partially renovated, one hundred nineteen room, full-service hotel ("HOTEL"), located on the outskirts of Galesburg, Illinois. The HOTEL, built in 1963, has an indoor recreation center featuring a large indoor swimming pool and gaming area, a restaurant, a lounge, a business center and a banquet room. William Stieren is the manager of the HOTEL.

The HOTEL was acquired by the DEBTOR in December, 1999, from NORTHWEST, after standing vacant for a number of months. Prior to January, 2002, the HOTEL remained closed and was under renovation. Since reopening in January, 2002, the HOTEL has been affiliated with Days Inn, a national chain. Seventy-two of the one hundred nineteen rooms are presently operational.[1] The DEBTOR estimates that $130,000 is needed to complete the renovation work. The HOTEL'S occupancy rate from January, 2002, to February, 2003, was only 18%. From the filing date through May 31, 2003, the DEBTOR has incurred a net operating loss of ($66,786) according to its monthly reports.

The DEBTOR seeks authorization to incur debt of $500,000 secured by a senior mortgage to Valley Bank, a new lender.[2] Upon completion of the work, the DEBTOR contends that it will be able to secure the full benefits of the Days Inn franchise, including the national reservation system, as well as attain a "preferred hotel" status with Burlington Northern Santa Fe Railroad. In support of its motion, the DEBTOR alleged that it had attempted but was unable to secure other financing and that the borrowing is essential to a successful reorganization. Taking the position that the value of the HOTEL property, both real and personal, is $4,450,000 and that the value of the liens against the property totals $3,150,000, the DEBTOR contends that the mortgagees and the lienholders will be adequately secured.[3]

---

1. When the HOTEL reopened in January, 2002, only fifty of its rooms were operational.

2. At the emergency hearing on April 16, 2003, this Court denied the DEBTOR'S request to borrow $80,000, the amount the DEBTOR sought to cover the projected deficit until the valuation hearing on May 23, 2003.

3. NORTHWEST holds a claim in excess of $2.1 million secured by a first mortgage on the HOTEL, an assignment of rents and a security interest in the DEBTOR'S personal property. The City of Galesburg holds a second priority lien on the HOTEL in the approximate amount of $500,000. Merchants Bonding Company holds a third priority lien

A valuation hearing was held on May 23, 2003. The two experts appraising the HOTEL came to substantially different conclusions of value. The DEBTOR'S appraiser testified that in his opinion the value of the HOTEL is $2,900,000, without taking into consideration a contract for rooms currently under negotiation, and $4,500,000 assuming the contract is completed. NORTHWEST'S appraiser testified that the value of the HOTEL is $1,750,000.

## DEBTOR'S APPRAISER

Peter Gloodt, the President of Gloodt Associates, Inc., an appraiser with an MAI (a Member of the Appraisal Institute) and a member of the International Society of Hospitality Consultants, testified on behalf of the DEBTOR. According to his appraisal, his firm has analyzed over two hundred hotels during the last ten years. Utilizing two of the three traditional methods of valuing real property, Mr. Gloodt valued the property under two different scenarios.[4] In addition to appraising the property "as is," Mr. Gloodt, being advised that the DEBTOR was negotiating with the Burlington Northern Santa Fe Railroad for a contract to cover twenty-five rooms per day, each day for a period of one year, for its crew members, appraised the property based on the assumption that the contract is finalized and that the purchaser could rely upon it as a source of revenue.

As a preliminary ruling, however, this Court rejects Mr. Gloodt's valuation based on the finalization of the Burlington North-

ern Santa Fe Railroad contract. No testimony was offered by a representative of the DEBTOR or by a representative of the Burlington Northern Santa Fe Railroad.[5] At this juncture of the proceedings, without more, the contract is a mere hope, not a fact, and cannot serve as the basis for an increase in value of the HOTEL. *See, Matter of St. Petersburg Hotel Associates, Ltd.,* 44 B.R. 944 (Bankr.M.D.Fla.1984).

Mr. Gloodt testified that the most appropriate method to value income producing property is the income capitalization approach. Although Mr. Gloodt utilized both the direct capitalization method and the discounted cash flow method under this approach, he considered the former to be most widely used by buyers of hotels similar to the HOTEL. Under that method, which he noted is ordinarily considered most appropriate when the property has achieved a stabilized level of operations and occupancy, which the HOTEL has not, the estimate of a single year's income expectancy at a projected stabilized income level, or an annual average of several year's income expectancies, is converted into an estimate of value by dividing that figure by an overall capitalization rate. This calculation requires a determination of the stabilized room revenue, which is a problematic determination for a recently renovated, underperforming hotel. Though not defined by Mr. Gloodt, the court in *Prudential Ins. Co. of America v. Parsippany–Troy Hills, Tp.,* 16 N.J.Tax 58 (1995), *aff'd* 16 N.J.Tax 148 (1996), offered the following:

in the approximate amount of $950,000. In addition, several mechanics lien claims have been asserted in the approximate amount of $469,000, some or all of which may be subsumed within the claim of Merchants Bonding Company.

4. Experts in the field of real estate appraisal generally use three methods to calculate fair

market value: the comparable sales method, the capitalization of net income method, and the depreciated reproduction cost method. Both Mr. Gloodt and Mr. Nelson deemed the depreciated reproduction cost method inappropriate.

5. Although Mr. Stieren was present at the hearing he did not testify.

As defined by the Appraisal Institute in the *The Appraisal of Real Estate* (10th ed.1992), to which defendant's appraiser referred, "[s]tabilized occupancy or income is defined as occupancy or income at that point in time when abnormalities in supply and demand or any additional transitory conditions cease to exist and the existing conditions are those expected to continue over the economic life of the property." *Id.* at 320–21.

In contrast, in the discounted cash flow method, the annual cash flow and sale proceeds over a typical holding period are converted into a value estimate by discounting to present value. This method is based upon earnings projections over a longer period of time and the predicted value can vary greatly depending upon the discount rate used. Curiously, while acknowledging that the HOTEL is not even close to reaching a stabilized occupancy, in which case the discounted cash flow method is most appropriate, Mr. Gloodt nevertheless opines that the direct capitalization method is most useful in valuing the HOTEL.

Identifying the DEBTOR'S competitive market as comprised of the seven hotels within the city of Galesburg, consisting of five hundred and fifty-nine rooms, three of which are full-service hotels, Mr. Gloodt opined that the DEBTOR ranks second in terms of quality, behind the Best Western Prairie Inn. He characterizes the remaining four hotels, affiliated with a national hotel chain and in good condition, as limited-service hotels.

Mr. Gloodt considered the historical financial data for the HOTEL to be unreliable, in view of the HOTEL'S recent renovation, to establish an income stream for purposes of applying the direct capitalization method. Because the income of the HOTEL was not stabilized, his method for developing a stabilized income stream for the HOTEL was based upon a *"Local Market Data Book"* purchased from Smith Travel Research, a research service which supplies historical and demand data for the hotel industry, as well as other sources used in the industry. His forecast of expenses and occupancy rates was based, in part, on the results of operations of comparable facilities. Although Mr. Gloodt acknowledges that the occupancy trends for the Galesburg market, based on actual rooms demand, have steadily declined from 1998 to 2002, he predicts an increase in occupancy rates, resulting from an aggressive marketing strategy to promote local and regional group-oriented social events. In his opinion, potential buyers would disregard the HOTEL'S recent poor performance because "they think they can do better."

Considering that the HOTEL would achieve a stabilized income at the end of three years, Mr. Gloodt selected a graduated occupancy rate, ranging from 49% in 2003, 54% in 2004, and stabilizing at 58% in 2005, based on data from the market area.[6] Based on a reported average daily rate of $65.00 for 2003 obtained from the manager of the Best Western, Mr. Gloodt selected an average daily room rate of $57 for 2003, $62 for 2004, $63 for 2005, $65 for 2006 and $67 for 2007. Mr. Gloodt esti-

**6.** Mr. Gloodt's projections for the competitive market are lower than those attributed to the HOTEL. He projects a 52% occupancy for the year end 2003, decreasing to 51% for 2004, rebounding in 2005 to 56%, and stabilizing in 2006 at 58%. The higher occupancy levels for the HOTEL are credited to its up-

graded condition, the twenty-four suite units and the Jacuzzi suites, available internet access, and its location near the public golf course, community college and lake recreation area. For these reasons, Mr. Gloodt projects that the HOTEL will actually outperform its competition during 2004 and 2005.

mated food and beverage income at $30 per room, phasing in that rate at a reduction of 20% the first year, followed by a 10% reduction in the second year. He selected a "stabilized" expense ratio of 75%, which is also increased by 10% the first year and 5% the second year, in accommodation of the minimal operations during the past two years while enduring the difficult renovation. After including other miscellaneous income and expenses, Mr. Gloodt projects net operating income of $89,000 for 2003, $302,000 for 2004, $476,000 for 2005, $457,000 for 2006 and $471,000 for 2007. Mr. Gloodt applied a capitalization rate of 12% to arrive at an overall value of $3,000,000. Under the discounted cash flow method, Mr. Gloodt arrived at a value of $2,900,000, selecting that figure as the value under the income approach.

Of the six comparable hotels Mr. Gloodt selected for use in determining the value of the HOTEL under the sales comparison approach, only one is located in Illinois. The newly constructed Country Inn & Suites in Galesburg, a limited-service, sixty-one room hotel, which opened in 1999, does not provide a particularly suitable comparison. As Mr. Gloodt noted, the other comparables, located in Kansas City, Missouri, Brook Park, Ohio, Cincinnati, Ohio, Louisville, Kentucky, and Madison, Wisconsin, are "scattered" and sold for prices in excess of $3,000,000.[7] He testified that the comparable sales method for valuing hotel property is useful only as a check on the income capitalization method. In his appraisal, Mr. Gloodt cautioned that this approach "should be viewed as having a wide confidence interval ... due to the

lack of recent comparable hotels sales with the subject's physical characteristics and location attributes." (G.A. p. V–24).[8] After making certain adjustments, Mr. Gloodt selected a final value of $3,300,000 under this approach. Mr. Gloodt's lack of confidence in this value is shared by the Court.

**NORTHWEST'S APPRAISER**

David Nelson, a certified real estate appraiser in both Iowa and Illinois, associated with Roy R. Fisher, Inc., testified on behalf of NORTHWEST. Like the DEBTOR'S appraiser, Mr. Nelson assumed for purposes of the appraisal that the renovations were completed and that the occupancy rates had stabilized. Mr. Nelson based his appraisal, in part, on a feasibility study prepared on June 1, 2001, in connection with the proposed development of the HOTEL.[9] Having appraised the HOTEL twice before, his familiarity with the property and its history was significant.

Mr. Nelson based his occupancy rate on a modest survey of other hotels, assuming that the occupancy rate of this HOTEL would be lower, based upon its location away from the competition and the troubled history of the HOTEL. He characterized the HOTEL as stigmatized, having operated under the cloud of foreclosure prior to being acquired by the DEBTOR. Mr. Nelson pointed out that the Best Western hotel has excellent access and visibility from I–74, whereas the DEBTOR is located just north of the U.S. 34 bypass and apart from the other hotels in that

---

**7.** The selling prices of those hotels were $3,100,000, $3,900,000, $4,370,000,000, $5,000,000 and $5,025,000.

**8.** "G.A." refers to the Gloodt Appraisal report, admitted into evidence at trial.

**9.** According to the feasibility study, the HOTEL has been "operated for many years in a very run-down condition."

section of town.[10]

Emphasizing the comparable sales approach, Mr. Nelson's appraisal used six comparables. The first comparable sale is the Valley West Inn in W. Des Moines, Iowa, which was sold on September 1, 2002, for $2,176,720. Because the sale was not a fully arms-length transaction, it was given little weight by Mr. Nelson. The second comparable sale is the Best Western in Des Moines, Iowa, which sold on October 20, 2000, for $2,100,000. That facility has one hundred and forty-eight rooms with a price per room of $14,189. Because this hotel subsequently underwent a substantial renovation and rebranding, Mr. Nelson opined that an upward adjustment would be appropriate. Mr. Nelson's fourth comparable sale is The Inn at Merle Hay in Johnston, Iowa, also very close to Des Moines, which sold on June 21, 2000, for $1,950,000. That facility has one hundred and forty-six rooms with a price per room of $13,356.

The fifth comparable sale, the Ramada Westfield Inn in Coralville, Iowa, was sold on May 17, 1999, for $2,675,000. The hotel has one hundred and fifty-eight rooms and the price per room was $16,930. According to Mr. Nelson, those three comparables were located in substantially larger markets and in mature or redeveloping areas.

Both the third comparable sale, the Wickliff Inn in Burlington, Iowa, on August 24, 2000, for $2,000,000, and the fifth comparable sale, the Best Western Iowan in Fort Madison, Iowa, on February 25, 1999, for $1,575,000, are considered to represent smaller markets than Galesburg and also lack proximity to an interstate highway. Mr. Nelson testified that the economic conditions in Fort Madison are worse than those currently being experienced by Galesburg.

In order to eliminate the size variations between the HOTEL and the comparables, Mr. Nelson employed a price per unit methodology verified by the price per square foot of building area. The comparable sales analysis yielded a range of $16,000 per unit on the high end and $13,000 per unit on the low end. Based upon location and market conditions, Mr. Nelson concluded that the appropriate unit rate for the HOTEL was $14,700 per unit which, at one hundred and nineteen rooms, yielded a Market Value Estimate, inclusive of personal property, of $1,750,000 under the sales comparison approach.

Valuing the HOTEL under the income approach, Mr. Nelson used a Gross Income Multiplier method and a Direct Capitalization method. To predict the HOTEL'S stabilized gross income, he multiplied a 47.5% occupancy rate by the room rates obtained from Mr. Stieren ($59 for ninety-two rooms, $79.00 for twenty-four suites and $99 for three Jacuzzi suites), for a projected annual room revenue of $1,321,291. To this amount he added income of $386,850 for food and beverage sales, for a total gross income of $1,708,141. Based on the feasibility study and data from the comparable sales, Mr. Nelson chose an expense ratio of 87.5%, leaving the HOTEL with a net operating income of $213,518. Applying a gross income multiplier of 1.00, Mr. Nelson arrived at a value of $1,710,000. Alternatively, applying an overall capitalization rate of 12%, Mr. Nelson arrived at a value of $1,780,000 under the direct capitalization method.

10. The other hotels are all located south of the U.S. 34 bypass in a more heavily populated commercial district.

## ANALYSIS

In determining the value of the HOTEL, this Court is cognizant that its value must be determined in light of the purpose of the valuation. 11 U.S.C. § 506(a). In this case, that purpose is to ascertain whether the creditors holding liens against the HOTEL property will remain adequately protected by the property's value even if a superpriority priming lien is granted to the post-petition lender.

Adequate protection is designed to preserve the secured creditor's position as it existed at the time of the bankruptcy filing. *In re Dunes Casino Hotel*, 69 B.R. 784, 793 (Bankr.D.N.J.1986). Where the debtor proposes a priming lien, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing. *In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3rd Cir.1994). A finding of adequate protection should be premised on facts, or on projections grounded on a firm evidentiary basis. *In re Mosello*, 195 B.R. 277, 292 (Bankr.S.D.N.Y.1996). Congress did not contemplate that a secured creditor could find its position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects. *Swedeland Development Group*, 16 F.3d at 567. The authorization to prime an existing lien should not be read as authorization to increase substantially the risk of the existing lender in order to provide security for a new, post-petition lender. When the effect of the new borrowing with a senior lien is merely to pass the risk of loss to the holder of the existing lien, the request for authorization should be denied. *3 Collier on Bankruptcy* ¶ 364.05[1] (15th Ed. Rev'd). The burden is on the movant to prove that existing lienholders are adequately protected. 11 U.S.C. § 364(d)(2).

The funds requested, in the amount of $500,000, would be used in part to complete the renovations, to the extent of $130,000. The balance of $370,000 would be used as operating capital to cover projected short-term operating deficits. Accordingly, at best, the post-petition loan proceeds will enhance the value of the property by $130,000.[11] The DEBTOR makes no claim that the value of the property will be enhanced by any more than that. Rather, the DEBTOR relies on the equity cushion that it alleges exists as the basis for adequate protection of the secured creditors.

The Court is not bound by the opinion of any expert witness and, in the exercise of its sound judgment, may accept or reject such testimony. *Helvering v. National Grocery Co.*, 304 U.S. 282, 295, 58 S.Ct. 932, 82 L.Ed. 1346 (1938). Both of the appraisers were competent. The DEBTOR'S appraiser was not from the Galesburg area, but he was both knowledgeable and well qualified, with extensive experience in valuing property in the hospitality industry. NORTHWEST'S appraiser was familiar with the subject property, the comparables he considered, and the economic conditions of the area, but had less experience in valuing hotel properties.

A major divergence between the appraisers centered around the projected occupancy rates for the HOTEL. NORTHWEST'S appraiser assumed a 47.5% occupancy rate whereas the DEBTOR'S appraiser projected a steadily in-

---

**11.** There is no guarantee that a buyer would pay $130,000 more for the property if the renovations are completed. Mr. Gloodt, how-ever, deducted the full amount of the $130,000 cost to complete the work as part of his value calculation.

creasing occupancy rate ranging from 49% to 58% in 2005. This Court finds Mr. Gloodt's optimism to be speculative, and that his assumptions used to project the HOTEL'S performance are unfounded. The economy in the Galesburg area has declined and this decline will have a significant impact on the hotel-motel industry. Mr. Gloodt acknowledges that the Director of the Galesburg Regional Economic Development Association predicts that the impact of Maytag's closing will result in an unemployment rate of between 15% to 20%, unprecedented since the mid–1980's, and in fact concurs with this outlook. (G.A. p. III–6).

He also acknowledges that the Galesburg hotel industry has been in general decline since 1999, as follows:

[O]ccupancy trends for the [HOTEL'S] competitive set have declined from the 57% ± level in 1998/99 to the 48%—53% level in 2001/02. The modest increase in the occupancy rate experienced in 2002 is primarily attributed to the adjustment for the [HOTEL'S] closed rooms which masks the fact that rooms demand declined by 6.3% in 2002 compared to 2001. The decline in rooms demand is attributed to the decline in business activity of major employers in the market. (G.A. p. IV–5).

■ In addition to the opening of a new Holiday Inn Express in 1997, and a Country Inn & Suites in 1999, a one hundred and eight room, full-service hotel was recently renovated after being purchased in a bankruptcy proceeding. In this Court's view, given the economic demise, the expanded lodging market may well have resulted in an overbuilding and an oversupply of hotel rooms in the area. Although the Court agrees that the current occupancy rate of only 18% does not preordain the HOTEL'S future performance due to the disruption in operations caused by the renovations, economic realities must be reckoned with and an appraiser's analysis is seriously undermined if it completely disregards the debtor's actual operating experience. *See, In re Fortune Smooth (U.S.) Ltd.,* 1993 WL 261478 (Bankr.S.D.N.Y.1993).

Mr. Gloodt also reports that interviews with local hotel operators revealed that Maytag accounted for around five thousand rooms, or approximately 5.0%, of the hotel demand in the competitive set of hotels. (G.A. p. IV–6). With Maytag's closing, a 5% reduction in occupancy rates is warranted on that basis alone.

Despite these negative indicators, Mr. Gloodt inexplicably predicts that the HOTEL will experience occupancy rates at the historically high rate of 58% within two to three years and that that rate will become the HOTEL'S "stabilized rate." This assumption is simply contrary to recent trends and the realities of the depressed Galesburg market. Mr. Gloodt's reliance on statistical average occupancy rates in other locales to support a prediction as to the HOTEL'S future performance is highly speculative and unrealistic. *Compare, Matter of St. Petersburg Hotel Associates, Ltd.,* 44 B.R. 944 (Bankr. M.D.Fla.1984) (Chapter 11 debtor's motion to borrow on superpriority basis denied where hotel's future financial performance predicated on assumptions that were mere expectations and highly speculative and unrealistic).

■ In addition, it appears to this Court that the comparables utilized by Mr. Gloodt, all located in communities much larger and more dynamic than Galesburg, are not amenable to a meaningful comparison. For instance, the Days Inn in Cleveland, Ohio, is strategically located near an airport. Evidence of comparable sales is relevant only where the properties are substantially similar to the subject proper-

ty in order to admit a reasonable comparison, and to provide for reasonable adjustment. *See, In re Mocco,* 222 B.R. 440 (Bkrtcy.D.N.J.1998).

Furthermore, Mr. Gloodt's net operating income (NOI) projections are quite optimistic. Assuming approval of the post-petition financing request as of May, 2003, based upon a projected occupancy rate of 49%, he projects NOI for the twelve month period through April, 2004, of $89,000. Given the HOTEL'S current average occupancy rate of 18% and an operating loss of approximately $67,000 during the brief post-petition period, it is difficult to accept such an instantaneous turnaround and return to profitability assumption. Out-years two and three are no less fanciful. For the twelve months ending April, 2005, Mr. Gloodt projects an occupancy rate of 54% and NOI of $302,000. For the following twelve months, he projects an occupancy rate of 58% and NOI of $476,000. These overly optimistic projections are impossible to square with the projections used by Mr. Gloodt for Galesburg's overall hotel market of 52% occupancy rate for 2003 and 51% for 2004. (G.A. p. IV–9). Using Mr. Gloodt's own numbers, he projects the HOTEL to outperform its competitors by about 10% over the next two years. These projections are unsupported by any evidentiary basis that would permit the Court to reasonably conclude that the HOTEL will outperform its competition in the near term. In fact, the evidence is to the contrary. Accordingly, in this Court's view, Mr. Gloodt's unrealistic assumptions result in significantly overstated valuations under both the Direct Capitalization method and the Discounted Cash Flow method.

This Court also finds that the value reached by NORTHWEST'S appraiser, in placing the most weight upon the comparable sales approach, is not free from shortcomings. Ordinarily, under that approach,

as noted in the DEBTOR'S appraisal, the appraiser provides, in the written appraisal, for individual adjustments to each of the sale prices of the comparables based upon particular differences. Relying principally on local market factors, Mr. Nelson declined to formulate his differentiation analysis. Notwithstanding that omission, however, it is clear from Mr. Nelson's testimony that he was familiar with the characteristics of the comparables and that appropriate factors were taken into consideration. While it is generally considered that the income approach is the preferred method for valuing income-producing properties such as the HOTEL, Mr. Nelson's determination under the income approach, reflecting a more realistic outlook than Mr. Gloodt, resulted in a value very close to that which he reached under the comparable sales approach. This Court perceives that the occupancy rate he utilized as well as the average room rates, which far exceed the present situation, represent as optimistic an increase as may reasonably be made.

Accordingly, for the purpose of determining whether the existing lienholders will be adequately protected if a senior priming lien is granted, the Court finds that Mr. Nelson's appraisal better reflects the realities of the Galesburg market and should be accorded more weight than Mr. Gloodt's. This Court determines the current fair market value of the HOTEL property, inclusive of personal property, to be $2.0 million. Because the existing liens total at least $3.5 million, there is no equity in the HOTEL property that would permit the existing lienholders to be adequately protected if a senior priming lien is granted. The DEBTOR has no unencumbered assets with which to provide those lienholders a replacement lien. Therefore, the DEBTOR has failed to carry its burden of proof under 11 U.S.C. § 364(d) and

its Emergency Motion to Obtain Secured Credit must be denied.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

## ORDER

For the reasons stated in an Opinion entered this day, IT IS HEREBY ORDERED that the DEBTOR'S Emergency Motion to Obtain Secured Credit should be and hereby is DENIED.